**UNITED STATES of America ex rel. Clarence Eugene WILSON, Petitioner-Appellant,**

v.

**WARDEN CANNON, STATEVILLE PENITENTIARY, Respondent-Appellee.**

No. 76–1050.

United States Court of Appeals, Seventh Circuit.

Argued June 17, 1976.

Decided July 28, 1976.

James A. Klenk, Chicago, Ill., for petitioner-appellant.

Clarence E. Wilson, pro se.

William J. Scott, Atty. Gen., Jayne Carr, Asst. Atty. Gen., Chicago, Ill., for respondent-appellee.

Before TONE and BAUER, Circuit Judges, and CAMPBELL, Senior District Judge.*

BAUER, Circuit Judge.

Clarence Wilson appeals from an order denying his petition for a writ of habeas corpus, primarily contending that he was deprived of his right to due process of law through the prosecution's knowing use of perjured testimony to obtain his conviction.

Wilson was convicted in the Circuit Court of Wayne County, Illinois, of murder, felony murder, and attempted burglary. Before sentencing, the prosecution *nolle prossed* the felony murder count. On direct appeal to the Illinois Supreme Court the convictions on the remaining two counts were affirmed. *People v. Wilson,* 51 Ill.2d 302, 281 N.E.2d 626 (1972). Wilson then filed a petition in the state trial court for post-conviction relief pursuant to the Illinois Post-Conviction Hearing Act, Ill.Rev. Stat.1971, Ch. 38, § 122–1 *et seq.,* alleging that the prosecutor knowingly used perjured testimony to obtain his conviction. After a hearing, the petition was dismissed.[1] The Illinois Appellate Court affirmed the ruling. *Wilson v. People,* 13 Ill.App.3d 675, 300 N.E.2d 576 (1973). Without opinion, the Illinois Supreme Court denied petitioner leave to appeal. After again attempting to vacate his conviction in the state courts through a post-conviction action pursuant to Ill.Rev.Stat.1971, Ch. 110, § 72, Wilson filed the instant petition for habeas corpus relief under 28 U.S.C. § 2254, *et seq.*

I.

The case against the petitioner in the trial court rested primarily on the testimony of four eyewitnesses to the events: two bystanders, Terry Goodwin and Wendel Newcomb, and the petitioner's two accomplices, James Sharp and Donald Lee Mitchell.

Goodwin and Newcomb testified to the following. In the early morning of June 1, 1970, they were riding with Oblong, Illinois, Police Chief Jack Fancil as he patrolled the community. About 2:30 a. m. Fancil drove into the driveway of a local grocery and parked directly in front of the open door to a wire cage enclosing a rear entrance to the store. The officer left his car, drew his handgun, and in Goodwin's words, "hollered twice for somebody to come out." Two men then emerged from the cage and, at Fancil's direction, assumed a spread-eagle position facing the market wall about 5 to 7 feet from the cage. While the two men were against the wall, a third man still in the cage fired at Officer Fancil. Fancil returned the fire before falling to the ground fatally wounded. Newcomb testified that the man closest to the cage also fell down. Neither Goodwin nor Newcomb could identify any of the men involved in the burglary.

The petitioner's accomplices, Sharp and Mitchell, testified that they and the petitioner attempted to burglarize the market. By their account, all three men were in the cage when Officer Fancil arrived and the

---

* The Honorable William J. Campbell, United States District Court for the Northern District of Illinois, is sitting by designation.

1. The circuit court also dismissed two amended petitions for post-conviction relief raising other issues.

two of them left the cage upon Officer Fancil's command, Wilson remaining inside. They said that they were spread-eagled against the wall when the shooting began. Mitchell testified that shots came from the cage. Sharp could not pinpoint the source of the shots. Sharp testified to having a gun on his person at the time and admitted discharging it during the shootout, but denied firing at Officer Fancil. Mitchell testified that he did not see Sharp fire any shots.

Wilson and Sharp both were shot during the exchange of gunfire. A ballistics specialist testified that a bullet removed from Wilson's leg possibly could have been fired from Officer Fancil's weapon, but he could not definitely establish its source.

A woman who lived two doors from the grocery store testified that after she was awakened by the shooting she saw one man drag another through the backyard of the home adjacent to the store into the backyard of her home. Wilson was found lying wounded in the woman's backyard. Burglary tools and the weapon used to murder Officer Fancil were found later in the yard through which the man was dragged.

Prior to Wilson's trial, Mitchell pleaded guilty to burglary and Sharp pleaded guilty to murder and attempted burglary. Neither had been sentenced at the time of Wilson's trial. At the trial, both Mitchell and Sharp denied that they had been offered leniency or any other promises in exchange for their testimony.[2] Sharp also denied that he had had a chance to discuss the case with Mitchell prior to trial.[3] State's Attorney Robert Whitmer emphasized these matters in his final argument to the jury.[4]

At the hearing in the state trial court on Wilson's petition for post-conviction relief, both Mitchell and Sharp testified that they had entered into agreements with the prosecution. Sharp disclosed that he pleaded guilty to murder and attempted burglary and agreed to testify against Wilson in exchange for the prosecutor's promise to recommend a sentence of from 16 to 40 years on the murder charge. Mitchell testified that he pleaded guilty to burglary and promised to testify against Wilson in exchange for the prosecutor's promise to drop the murder charge pending against him. Both witnesses testified that the prosecutor

---

2. On cross-examination by the defense Mitchell testified:

"Q. You were offered no deal?
A. No.
Q. To testify?
A. None whatsoever.
Q. And you have not been sentenced?
A. No, not yet." (Tr. 180)

On re-direct examination by the prosecutor Mitchell testified:

"Q. Have I or any other person made any promises to you for leniency or otherwise to get you to testify here today?
A. No, sir.
Q. Have I or anyone else instructed you what to say here today?
A. No, sir.
Q. Have we stressed anything you should do in your conduct?
A. No, sir." (Tr. 184)

On direct examination by the prosecutor, Sharp testified:

"Q. You have come to testify here today in this court, have you been made any promises to testify?
A. No, sir, I haven't." (Tr. 402)

3. On direct examination by the prosecutor, Sharp testified:

"Q. After you were taken into custody by the police, have you had a chance to discuss this or talk with Mitchell?
A. No, sir, I haven't.
Q. Have you seen Mitchell?
A. Only at a distance.
Q. You have never had an opportunity to talk anything over with him?
A. No, sir, I haven't." (Tr. 402)

4. The prosecutor argued:

"There was something said on accomplices and what they have to gain or lose, I again want to point out one thing to you; these accomplices in their own testimony to you said they had no chance to confer with each other and compare their stories. And, each man as he told his story here today was his own story [sic] because he had no chance to compare his story with the other person involved, or the day he testified. Sure, he had nothing to gain; said he had nothing to gain by testifying here before you because no one made him any promises to come here and testify. This was pointed out to you." (Tr. 446–47)

had instructed them to deny at trial the existence of any such agreements. After the petitioner's conviction, Sharp received the promised sentence and Mitchell was sentenced only on the burglary charge.

State's Attorney Whitmer testified at the hearing:

"We did have some plea negotiations and promises of sentences provided the facts substantiated their position as a result of the hearing of the facts at the trial of Mr. Wilson. They were promises made upon pleas of guilty provided the facts were as they appeared from both their separate statements."

He then said that there was no formal agreement in exchange for Mitchell and Sharp's testimony, and acknowledged that he had instructed Mitchell to deny, if asked at trial, that he had been promised leniency in exchange for his testimony.

Sharp and Mitchell also disclosed that they conversed in the Crawford County Jail prior to petitioner's trial through a hole in the floor between their cells. Sharp testified that the State's Attorney instructed him to deny that he and Mitchell had talked before trial.

Robert Stewart, the Crawford County Sheriff, testified that to his knowledge Mitchell and Sharp had no opportunity to communicate before trial. He did, however, acknowledge that Sharp was jailed on the floor below Mitchell; that there was a hole in the floor and that it was possible to talk through that hole. State's Attorney Whitmer also testified that to his knowledge Mitchell and Sharp had no opportunity to communicate before trial. Whitmer could not recall whether he had instructed Mitchell and Sharp to deny that they had talked before trial.

During the oral argument before this Court, counsel for the respondent State of Illinois acknowledged that Sharp and Mitchell testified untruthfully at trial regarding their agreements with the prosecutor and that the State's Attorney knew that their testimony on that issue was untruthful.

## II.

Petitioner argues that the presentation of the perjured testimony at trial regarding Mitchell and Sharp's plea bargaining and pretrial communications prejudiced his trial so as to deprive him of his right to due process of law under the Fourteenth Amendment.

The district court granted summary judgment to the respondent on these claims on the ground that they were based on factual issues determined by the Illinois court and that the state court record fairly supported such a determination. 28 U.S.C. § 2254(d) (unpublished Memorandum Opinion and Order, No. 74 C 1417, November 25, 1974).

In the context of this case, we think 28 U.S.C. § 2254(d) is inapplicable. The issue of the use of perjured testimony presented in this habeas petition is one of law, not of fact. No question remains regarding whether perjury occurred or whether the prosecutor knew perjury occurred, as counsel for the state acknowledged during oral argument. The only question left is whether the perjured testimony so tainted the trial that the petitioner was deprived of his constitutional right to due process of law. This inquiry involves the application of federal constitutional standards to the facts found in the state post-conviction hearing. The federal courts are obligated to independently conduct such an inquiry. As the Supreme Court stated in *Townsend v. Sain,* 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963):

"Although the district judge may, where the state court has reliably found the relevant facts, defer to the state court's findings of fact, he may not defer to its findings of law. It is the district judge's duty to apply the applicable federal law to the state court fact findings independently. The state conclusions of law may not be given binding weight on habeas."

## III.

The federal constitutional standards we must apply were set forth in

*Giglio v. United States,* 405 U.S. 150, 153–154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972):

> "As long ago as *Mooney v. Holohan,* 294 U.S. 103, 112, [55 S.Ct. 340, 342, 79 L.Ed. 791] (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' This was reaffirmed in *Pyle v. Kansas,* 317 U.S. 213, [63 S.Ct. 177, 87 L.Ed. 214] (1942). In *Napue v. Illinois,* 360 U.S. 264, [79 S.Ct. 1173, 3 L.Ed.2d 1217] (1959), we said, '[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' *Id.,* at 269, [79 S.Ct. 1173 at 1177]. Thereafter *Brady v. Maryland,* 373 U.S. [83] at 87, [83 S.Ct. 1194 at 1197, 10 L.Ed.2d 215], held that suppression of material evidence justifies a new trial 'irrespective of the good faith or bad faith of the prosecution.' See American Bar Association, Project on Standards for Criminal Justice, Prosecution Function and the Defense Function § 3.11(a). When the 'reliability of a given witness may well be determinative of guilt or innocence,' non-disclosure of evidence affecting credibility falls within this general rule. *Napue, supra,* 360 U.S. at 269, [79 S.Ct. 1173 at 1177]. We do not, however, automatically require a new trial whenever 'a combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense not likely to have changed the verdict . . . .' *United States v. Keogh,* 391 F.2d 138, 148 (CA2 1968). A finding of materiality of the evidence is required under *Brady, supra,* 373 U.S. at 87, [83 S.Ct. 1194 at 1196, 10 L.Ed.2d 215]. A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . .' *Napue, supra,* 360 U.S. at 271, [79 S.Ct. 1173, at 1178]."

### A.

Applying this standard to the claim of constitutional error arising from the per-jured testimony regarding prosecutorial promises in exchange for Mitchell and Sharp's testimony, we hold that the petitioner's right to due process of law has been abridged.

There is no dispute here that Mitchell and Sharp testified untruthfully regarding the existence of an agreement with the prosecutor. There is also no dispute that the prosecutor knew of the untruthfulness of the testimony and did nothing to correct it. In fact, like the prosecutor in *Napue v. Illinois,* 360 U.S. at 270–271, 79 S.Ct. 1173, the prosecutor here emphasized the nonexistence of any agreements in his questioning, and, like the prosecutor in *Giglio, supra* 405 U.S. at 152, 92 S.Ct. 763, he stressed the nonexistence of any agreements in his closing argument.

It also cannot be disputed that the perjured testimony suggesting that the witnesses had no interest in testifying was a crucial factor in the jury's determination of the credibility of Mitchell and Sharp.

> "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois, supra,* 360 U.S. at 269, 79 S.Ct. at 1177.

The only point in dispute is whether the evidence was material to the petitioner's conviction. Under the *Napue-Giglio* standard of materiality which requires a new trial if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury", *Napue, supra,* at 271, 79 S.Ct. at 1178. *Giglio, supra,* 405 U.S at 154, 92 S.Ct. 763, the testimony here was material to the petitioner's conviction for murder, but not to his conviction for attempted burglary.

The petitioner's conviction for murder rests solely on Mitchell and Sharp's testimony. No independent eyewitness could identify the petitioner as the person who shot the officer. Apart from the testimony of Mitchell and Sharp, the only evidence that

petitioner shot Officer Fancil was that the petitioner was found near the scene of the shooting wounded by a bullet that possibly came from the officer's gun.

█ Connected with the testimony of Newcomb and Goodwin establishing that Officer Fancil shot his assailant, this evidence seems to prove that Wilson shot Fancil. However, this evidence is tempered by the fact that Sharp was also shot during the incident. This additional fact makes it clear that Mitchell and Sharp's testimony was essential to secure petitioner's murder conviction. Without it the jury could not determine whether Wilson or Sharp fired the shots which killed Officer Fancil.[5]

On the other hand, we do not think that Mitchell and Sharp's false testimony regarding prosecutorial deals materially affected the petitioner's conviction for attempted burglary. The independent testimony which established that immediately after the shooting Wilson was dragged through the backyards of houses near the scene of the crime, that he was found wounded in one of the yards, and that burglary tools were discovered in the yard through which he was dragged was overwhelming evidence of his participation in the attempted burglary. Given this evidence, there is no reasonable likelihood that Mitchell and Sharp's testimony affected the judgment of the jury on this count.

### IV.

Petitioner's claims of due process deprivations based on Mitchell and Sharp's per-jured testimony regarding their pretrial communications and on the alleged suppression at trial of exculpatory evidence by the government need not be confronted here since we have found that a new trial is required. Our decision regarding the conduct of the past trial with respect to this evidence will not aid in the petitioner's new trial since we can presume that at the retrial the witnesses will not again commit perjury nor will the allegedly exculpatory evidence again be withheld. Neither of these claims materially affects the petitioner's conviction for attempted robbery.

### V.

█ Since we find that as a matter of law the petitioner was denied his constitutional right to due process, there is no need for us to remand this case to the district court for an evidentiary hearing. See *Ruetz v. Lash,* 500 F.2d 1225, 1229 (7th Cir. 1974); *Macon v. Lash,* 458 F.2d 942, 950 (7th Cir. 1972). Instead we order the district court judgment affirmed as to the burglary conviction and vacated as to the murder conviction and remand this case to that court for the entry of an appropriate order changing the petitioner's mittimus of judgment and sentence to reflect only the judgment order and sentence for attempted burglary. Within a reasonable time to be fixed by the district court, the State of Illinois shall be given the opportunity to retry the petitioner on the murder charge.[6]

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**

---

**5.** The state argues that the petitioner waived his right to claim error based on the perjured testimony regarding the prosecutor's deals with Mitchell and Sharp on the ground that the defense knew or should have known the contents of an article in a local newspaper which mentioned the deals. The article was attached to a defense motion for change of venue. The waiver allegedly occurred when the defense counsel did not cross-examine Sharp regarding the deal and only asked Mitchell one question regarding it.

Even if counsel for the defense knew the contents of the article before the cross-examination, which is not clear from the record, his allegedly limited cross-examination of Sharp and Mitchell cannot be deemed a knowing and intelligent waiver of the petitioner's fundamental right to a trial free from perjured testimony. *Fay v. Noia,* 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Waiver in this context cannot be lightly presumed. The absence of a more thorough cross-examination is light evidence indeed.

**6.** On this appeal, the Court relied on the argument and brief of appointed counsel for the petitioner rather than on the petitioner's *pro se* brief.