438 S.E.2d 501

**In the Matter of an INVESTIGATION OF the WEST VIRGINIA STATE POLICE CRIME LABORATORY, SEROLOGY DIVISION.**

No. 21973.

Supreme Court of Appeals of West Virginia.

Report Submitted Nov. 4, 1993.

Opinion Decided Nov. 10, 1993.

Alexander Ross, Sp. Pros. Atty., Charleston.

George Castelle, Chief Public Defender of Kanawha County, Charleston.

MILLER, Justice:

This case is an extraordinary proceeding arising from a petition filed with this Court on June 2, 1993, by William C. Forbes, Prosecuting Attorney for Kanawha County, requesting the appointment of a circuit judge to conduct an investigation into whether habeas corpus relief should be granted to prisoners whose convictions were obtained through the willful false testimony of Fred S. Zain, a former serologist with the Division of Public Safety. On June 3, 1993, in response to the petition, we entered an order appoint-

ing the Honorable James O. Holliday, a retired circuit judge, to supervise an investigation of the Serology Division at the West Virginia State Police Crime Laboratory.[1] On November 4, 1993, after an extensive, five-month investigation, Judge Holliday filed his report with this Court, a copy of which is attached as an Appendix to this opinion.

The report chronicles the history of allegations of misconduct on the part of Trooper Zain, beginning with the wrongful conviction of Glen Dale Woodall, who was eventually released after DNA testing conclusively established his innocence.[2] The report further discusses allegations of misconduct and incompetence by Trooper Zain's subordinates during his tenure with the Division of Public Safety. Finally, the report summarizes the findings of James McNamara, Laboratory Director of the Florida Department of Law Enforcement, and Ronald Linhart, Supervisor of Serology in the Crime Laboratory for the Los Angeles County Sheriff's Department, who were selected by Barry Fisher, Chairman of the Laboratory Accreditation Board of the American Society of Crime Laboratory Directors (ASCLD), to conduct an analysis of the policies, procedures, practices, and records of the Serology Division during Trooper Zain's tenure.

The ASCLD report and the deposition testimony of fellow officers in the Serology Division during Trooper Zain's tenure support the multiple findings of fact by Judge Holliday regarding Trooper Zain's long history of falsifying evidence in criminal prosecutions. Specifically, the report states:

"The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results." (Footnote omitted).

The report by Judge Holliday further notes that the ASCLD team concluded that these irregularities were " 'the result of systematic practice rather than an occasional inadvertent error' " and discusses specific cases that were prosecuted in which Serology Division records indicate that scientifically inaccurate, invalid, or false testimony or reports were given by Trooper Zain.

In addition to investigating what occurred during Trooper Zain's tenure in the Serology Division, Judge Holliday also explored how these irregularities could have happened. The report notes that many of Trooper Zain's former supervisors and subordinates regarded him as "pro-prosecution." The report further states: "It appears that Zain was quite skillful in using his experience and position of authority to deflect criticism of his work by subordinates." Although admittedly beyond the scope of the investigation, the

---

1. This case is not the first time we have utilized this procedure. We returned an original habeas corpus petition to a special judge in *Crain v. Bordenkircher*, 176 W.Va. 338, 342 S.E.2d 422 (1986), with directions that evidence be taken to determine if the conditions of confinement at the West Virginia Penitentiary constituted cruel and unusual punishment. After the hearings, we concluded in *Crain* that the conditions of confinement did constitute cruel and unusual punishment.

In *Harrah v. Leverette*, 165 W.Va. 665, 271 S.E.2d 322 (1980), we accepted an original proceeding in habeas corpus by prisoners who claimed that they were beaten and subjected to cruel and unusual punishment at a medium security prison. We appointed a special master to take evidence and file a report with this Court, upon which we acted. *See also State ex rel. K.W. v. Werner*, 161 W.Va. 192, 242 S.E.2d 907 (1978) (abusive practices at Pruntytown juvenile facility).

2. Mr. Woodall's original conviction was affirmed in *State v. Woodall*, 182 W.Va. 15, 385 S.E.2d 253 (1989). There, we acknowledged the validity of DNA testing. Subsequently, in an order dated March 29, 1990, we authorized the performance of a DNA test on Mr. Woodall.

report by Judge Holliday notes that there was evidence that Trooper Zain's supervisors may have ignored or concealed complaints of his misconduct. Finally, the report discusses ASCLD criticisms of certain operating procedures during Trooper Zain's tenure, which the report concludes "undoubtedly contributed to an environment within which Zain's misconduct escaped detection." According to the report, these procedural deficiencies included:

> "(1) no written documentation of testing methodology; (2) no written quality assurance program; (3) no written internal or external auditing procedures; (4) no routine proficiency testing of laboratory technicians; (5) no technical review of work product; (6) no written documentation of instrument maintenance and calibration; (7) no written testing procedures manual; (8) failure to follow generally-accepted scientific testing standards with respect to certain tests; (9) inadequate record-keeping; and (10) failure to conduct collateral testing."

▮▮▮ Judge Holliday's report correctly concludes that Trooper Zain's pattern and practice of misconduct completely undermined the validity and reliability of any forensic work he performed or reported, and thus constitutes newly discovered evidence. It further recognizes the appropriate standard of review in cases of newly discovered evidence as set forth by this Court most recently in Syllabus Point 1 of *State v. O'Donnell*, 189 W.Va. 628, 433 S.E.2d 566 (1993):

> " ' "A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that [defendant] was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumula-

tive evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side." Syllabus, *State v. Frazier*, 162 W.Va. [9]35, 253 S.E.2d 534 (1979), *quoting*, Syl. pt. 1, *Halstead v. Horton*, 38 W.Va. 727, 18 S.E. 953 (1894).' Syl. pt. 1, *State v. King*, 173 W.Va. 164, 313 S.E.2d 440 (1984)."

*See also* Annot., *Perjury or Wilfully False Testimony of Expert Witness as Basis for New Trial on Ground of Newly Discovered Evidence*, 38 A.L.R.3d 812 (1971).

Newly discovered evidence is not the only ground on which habeas relief can be afforded. It has long been recognized by the United States Supreme Court that it is a violation of due process for the State to convict a defendant based on false evidence. Chief Justice Warren, writing for a unanimous court in *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959), summarized this principle:

> "*First*, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.... The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." (Emphasis in original; citations omitted).

In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), a unanimous Court again concluded that the Government was responsible for false testimony on the part of one of its witnesses even though the prosecutor was unaware of its falsity. In *Giglio*, a Government witness was promised immunity if he would testify against the defendant. This promise was made by an assistant district attorney who was not involved in the *Giglio* trial. The trial prosecutor was unaware of the promise. On cross-examination, the witness denied that he received any promise of immunity. The Supreme Court in *Giglio* began by reaffirming *Napue*'s principle:

"In *Napue* ..., we said, '[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' [360 U.S.] at 269, [79 S.Ct. at 1177], 3 L.Ed.2d at 1221. Thereafter *Brady v. Maryland*, 373 U.S. [83], at 87, 10 L.Ed.2d [215] at 218, 83 S.Ct. 1194 [at 1196] (1963), held that suppression of material evidence justifies a new trial 'irrespective of the good faith or bad faith of the prosecutor.'" 405 U.S. at 153–54, 92 S.Ct. at 766, 31 L.Ed.2d at 108. (Citations omitted).

It then made this observation as to responsibility of the prosecutor's office: "Moreover, whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government." 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 109.

 Thus, in this case, it matters not whether a prosecutor using Trooper Zain as his expert ever knew that Trooper Zain was falsifying the State's evidence. The State must bear the responsibility for the false evidence. The law forbids the State from obtaining a conviction based on false evidence.[3]

 It is also recognized that, although it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict. As explained in *United States ex rel. Wilson v. Warden Cannon*, 538 F.2d 1272, 1277 (1976), *citing Giglio*, 405 U.S. at 153–54, 92 S.Ct. at 766, 31 L.Ed.2d at 108:

"'A finding of materiality of the evidence is required under *Brady* [*v. Maryland*, 373 U.S. 83] at 87, [83 S.Ct. 1194 at 1196, 10 L.Ed.2d 215 at 218–19 (1963)]. A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury ..." *Napue* [*v. Illinois*, 360 U.S. 264] at 271, [79

S.Ct. 1173, at 1178, 3 L.Ed.2d 1217, at 1222 (1959)]."

There is some divergence of view among the federal courts of appeals as to the test to be used in determining what impact false testimony will have on the ultimate question of whether a criminal conviction should be set aside. For example, in *United States v. Langston*, 970 F.2d 692, 700 (10th Cir.), *cert. denied sub nom., Francis v. United States*, — U.S. ——, 113 S.Ct. 439, 121 L.Ed.2d 358 (1992), the court made this statement with regard to ascertaining the impact of false testimony:

"The test for materiality is the same as the test for harmless constitutional error. *United States v. Bagley*, 473 U.S. 667, 679 n. 9, 680, 105 S.Ct. 3375, 3382 & n. 9, 87 L.Ed.2d 481 [492 n. 9] (1985). The test for harmless constitutional error is 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."' *Yates v. Evatt*, 500 U.S. 391, [403,] 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 [448] (1991) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 [710] (1967). 'To say that an error did not contribute to the verdict is, rather to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.' *Yates*, [500 U.S. at 403] 111 S.Ct. at 1893 [114 L.Ed.2d at 449]. *Yates* thus instructs us 'to make a judgment about the significance' of the tainted evidence relative to the remaining evidence."

A more general standard was announced in *United States v. Lopez*, 985 F.2d 520, 523 (11th Cir.1993), where this cryptic test was given: "The standard of review is whether the prosecutor's failure to correct false evidence may have had an effect on the outcome of the trial." (Citations omitted).

Other jurisdictions also have adopted tests for determining the impact of false testimony. The Supreme Court of Illinois in *People*

---

**3.** In *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967), the State obtained a conviction based on testimony that certain stains on underwear owned by the defendant matched the victim's blood type. In a subsequent federal habeas corpus case, it conclusively was shown that the stains were paint. The conviction was set aside by a unanimous United States Supreme Court.

*v. Cornille,* 95 Ill.2d 497, 514, 69 Ill.Dec. 945, 954, 448 N.E.2d 857, 866 (1983), relying on its prior decisions, set this standard: "Once the defendant establishes the condemned use of false testimony, he is entitled to a new trial unless the State can establish beyond a reasonable doubt that the false testimony was immaterial in that it did not contribute to the conviction." (Citations omitted). Wisconsin's Supreme Court in *State v. Nerison,* 136 Wis.2d 37, 54, 401 N.W.2d 1, 8 (1987), gave this standard: "Due process requires a new trial if the prosecutor in fact used false testimony which, in any reasonable likelihood, could have affected the judgment of the jury." *See State v. Glover,* 564 So.2d 191 (Fla.App.1990); *State v. Towns,* 432 A.2d 688 (R.I.1981).

■ Where evidentiary error is concerned, however, the ultimate question is the impact on the verdict. Our test for evidentiary error is contained in Syllabus Point 2 of *State v. Atkins,* 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980):

"Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury."

*See also* Syllabus Point 4, *State v. Ferrell,* 184 W.Va. 123, 399 S.E.2d 834 (1990), *cert. denied,* 501 U.S. 1207, 111 S.Ct. 2801, 115 L.Ed.2d 974 (1991); Syllabus Point 6, *State v. Banjoman,* 178 W.Va. 311, 359 S.E.2d 331 (1987).

Judge Holliday's report concludes that, in light of the overwhelming evidence, further litigation of whether Trooper Zain's misconduct significantly tainted his participation in numerous criminal prosecutions is unwarranted. In this regard, the report states: "It is believed that, as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding." This finding was made with the concurrence of Alexander Ross, Coordinator of the West Virginia Prosecuting Attorneys Association, who was appointed by Judge Holliday as special prosecuting attorney to represent the interests of the State of West Virginia in this investigation, and George Castelle, Chief Public Defender of Kanawha County, who was appointed by Judge Holliday as special public defender to represent the interests of prisoners whose convictions might be affected by this investigation.

■ We agree with Judge Holliday's recommendation that in any habeas corpus hearing involving Zain evidence, the only issue is whether the evidence presented at trial, independent of the forensic evidence presented by Trooper Zain, would have been sufficient to support the verdict. As we have earlier stated, once the use of false evidence is established, as here, such use constitutes a violation of due process. The only inquiry that remains is to analyze the other evidence in the case under the *Atkins* rule to determine if there is sufficient evidence to uphold the conviction.

■ In those cases in which Zain evidence was presented and a guilty plea was entered, the habeas court's task will require a different analysis. The issue then becomes whether the defendant should be allowed to withdraw the guilty plea. We recognized in Syllabus Point 2 of *State v. Pettigrew,* 168 W.Va. 299, 284 S.E.2d 370 (1981), that after a defendant enters a guilty plea and is sentenced, an attempt to withdraw the guilty plea only can be done on a showing of manifest necessity:

" 'Where the guilty plea is sought to be withdrawn by the defendant after sentence is imposed, the withdrawal should be granted only to avoid manifest injustice.'

Syl. pt. 2, *State v. Olish,* [164] W.Va. [712], 266 S.E.2d 134 (1980)."

Ordinarily, at a guilty plea hearing there is no formal testimony given by the State to establish the defendant's guilt, although the defendant is generally called upon to provide a factual basis for the acceptance of the plea. The focus of such a hearing is to determine whether the plea is voluntary, whether the defendant understands the rights he is waiving by virtue of the plea and the nature of the charge against him,[4] and whether the court is satisfied that a factual basis exists for accepting the plea.[5]

In the few cases we have found that deal with setting aside a guilty plea because of false evidence, the courts appear to follow a rule similar to that set out in *State v. Pettigrew, supra.* In *Shepard v. United States,* 363 A.2d 291 (D.C.App.1976), the defendant, after being sentenced, contended that a co-suspect in the crime who had testified against him at his preliminary hearing later renounced his testimony, stating that it was coerced by the district attorney. As its standard of review, the *Shepard* court stated: "On review, we concur in the trial court's conclusion that [defendant] failed to carry his burden of showing that an upset of the plea was required to correct 'manifest injustice'." 363 A.2d at 293. (Footnote and citations omitted). It went on to conclude that this evidence was too tenuous to have affected the guilty plea, noting that "[t]he offer of a plea is a solemn act[.]" 363 A.2d at 294.

In *Commonwealth v. Burgess,* 446 Pa. 383, 288 A.2d 810 (1972), the defendant claimed his guilty plea should be set aside because a laboratory technician admitted to falsifying her credentials. However, the court found that other evidence amply demonstrated the defendant's guilt.

Obviously, there are many factors that may be considered in determining, in the guilty plea context, whether a manifest injustice has occurred. In those instances where a defendant made his guilty plea without any

knowledge of the Zain material, it cannot be said to have influenced the plea. It would seem that only in those instances where a defendant can show that the Zain material was communicated to him prior to the guilty plea would the habeas court have to consider the matter further. Even where such further action is warranted, the test still will be whether all the circumstances surrounding the plea and the evidence of the defendant's involvement in the crime warrant a conclusion that manifest injustice occur if the guilty plea is not set aside.

As Judge Holliday's report recognizes, in these cases it has not been possible to identify the final outcome from the forensic reports. Nor do these reports cover every case in which Trooper Zain may have been involved. Finally, it was not the function of Judge Holliday's inquiry to determine the current status of such defendants.

In order to resolve these matters, we will direct the Clerk of this Court to prepare and cause to be distributed to the Division of Corrections an appropriate post-conviction habeas corpus form. This form will be designed to identify those individuals who desire to seek habeas relief on a Zain issue. As a condition for obtaining such relief, the form will require the relator to consent to a DNA test. The right of the State to obtain similar tests has been sanctioned by the United States Supreme Court in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). *See also State v. Julius,* 185 W.Va. 422, 408 S.E.2d 1 (1991). This Court will then determine an appropriate independent laboratory to conduct the DNA test at the State's expense.

Note 38 of Judge Holliday's report contains a final recommendation with regard to unsealing the information gathered in the hearing before him:

"As a final matter, it is recommended that other than Midkiff's personnel file, Moreland's personnel file, and the McDo-

---

4. *See Call v. McKenzie,* 159 W.Va. 191, 220 S.E.2d 665 (1975).

5. Rule 11(f) of the West Virginia Rules of Criminal Procedure provides: *"Determining Accuracy of Plea.* Notwithstanding the acceptance of a

plea of guilty, the court should not enter a judgment upon such a plea without making such inquiry as shall satisfy it that there is a factual basis for the plea."

well investigation file, other than McDowell's notations regarding conversations with the FBI regarding Zain, the entire investigative file in this matter, including this report, the ASCLD report, correspondence, orders, transcripts, and other documents, should be made available for public inspection. It is further recommended that several copies of these materials should be made available to every correctional facility in which petitioners who seek habeas corpus review pursuant to this report are incarcerated."

We concur with this recommendation and order that the records be unsealed except for the exemptions noted.

The matters brought before this Court by Judge Holliday are shocking and represent egregious violations of the right of a defendant to a fair trial. They stain our judicial system and mock the ideal of justice under law. We direct Prosecutor Forbes to pursue any violation of criminal law committed by Trooper Zain and urge that he consult with the United States District Attorney for the Southern District of West Virginia. We direct our Clerk to send all relevant papers to both of them. This conduct should not go unpunished.

This corruption of our legal system would not have occurred had there been adequate controls and procedures in the Serology Division. Judge Holliday's report is replete with the deficiencies and derelictions that existed and as were uncovered by the American Society of Crime Laboratory Directors whose team reviewed the forensic data.[6] To ensure that this event does not recur, we direct the Superintendent of the Division of Public Safety to file with the Clerk of this Court a

report outlining the steps that are to be taken to obtain certification of the State Police forensic laboratory by the American Society of Crime Laboratory Directors. We direct that this report be filed within sixty days from the date of the entry of this opinion.

Finally, we wish to commend Judge Holliday for the thoroughness of his report and the quality of the investigation he conducted. We also wish to recognize the able assistance given to Judge Holliday by our Administrative Director, Ted Philyaw, and our Clerk, Ancil Ramey. The same appreciation is extended to Alexander Ross, George Castelle, James McNamara, and Ronald Linhart for their excellent services in this investigation. We adopt Judge Holliday's report and order its immediate implementation.

Implementation of report directed.

### APPENDIX

### IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

IN THE MATTER OF AN INVESTIGATION OF THE WEST VIRGINIA STATE POLICE CRIME LABORATORY, SEROLOGY DIVISION

### CIVIL ACTION NO. 93–MISC–402

### REPORT

This report is filed pursuant to an administrative order by Chief Justice Margaret L. Workman directing an investigation of the policies, procedures, and records of the West Virginia State Police Crime Laboratory, Serology Division, and contains findings of fact,

---

6. Judge Holliday in note 7 of his report outlines the work of this organization:

"The American Society of Crime Laboratory Directors, a national association, has established a voluntary Crime Laboratory Accreditation Program in which any crime laboratory may participate in order to demonstrate that its management, operations, personnel, procedures, instruments, physical plant, security, and safety procedures meet certain standards. These standards, which are incorporated into an Accreditation Manual, represent the consensus of the members of ASCLD. For example, the two major requirements for ASCLD/LAB accreditation include (1) periodic, internal case report and case note re-

view and (2) proficiency testing in which blind and/or open samples of which the 'true' results are unknown to the examiner prior to the analysis. State police laboratories which have received ASCLD/LAB accreditation include the Illinois State Police, the Arizona Department of Public Safety, the Washington State Patrol, the Missouri State Highway Patrol, the Michigan State Police, the Oregon State Police, the Texas Department of Public Safety, the North Carolina State Bureau of Investigation, the Virginia Bureau of Forensic Sciences, the Florida Department of Law Enforcement, the Wisconsin State Crime Laboratory, and the Indiana State Police."

conclusions of law, and recommendations regarding actions to be taken in light of the investigation.[1]

## PROCEDURAL HISTORY

In 1987, Glen Dale Woodall was convicted of multiple felonies, including two counts of sexual assault, and sentenced to a prison term of 203 to 335 years. *State v. Woodall,* 182 W.Va. 15, 385 S.E.2d 253 (1989). At Woodall's trial, forensic testimony by West Virginia State Police Officer Fred S. Zain indicated that, based upon his scientific analysis of semen recovered from the victims, "[T]he assailant's blood types ... were identical to Mr. Woodall's." *Id.* at 22, 385 S.E.2d at 260. Zain further testified that this combination of blood traits would statistically occur in only 6 of every 10,000 males in West Virginia. *Id.* Although Woodall's conviction was affirmed on appeal, DNA testing ordered by the Supreme Court of Appeals in a subsequent habeas corpus proceeding conclusively established that he could not have been the perpetrator. In 1992, Woodall's conviction was overturned by the trial court, and he was awarded his freedom.

Following Woodall's release, he retained counsel to institute a suit against the State of West Virginia for false imprisonment. After conducting an investigation, including review of Zain's work as Chief of Serology at the Division of Public Safety, the State's insurer recommended settlement for the policy limit of $1 million. Following consultation with the Colonel J.R. Buckalew, Superintendent of the Division of Public Safety, the State of West Virginia settled Woodall's case for $1 million.[2]

At the direction of Colonel Buckalew, an internal audit was conducted regarding Zain's work in the serology department. Later, a grand jury investigation of possible criminal conduct was instituted in the Circuit Court of Kanawha County. Finally, in response to questions regarding the propriety of the insurance settlement, the legislative Commission on Special Investigation initiated its own probe.

The internal audit, conducted by State Police Officers R.S. White and T.S. Smith, identified certain improprieties with respect to Zain's work, but concluded that "no material inclusion or exclusion errors were made...."[3] Colonel Buckalew summarized these findings to William C. Forbes, Prosecuting Attorney for Kanawha County, in a letter dated November 10, 1992, stating that, "Based on our review of those files, we concluded that there is no need to take any further action with respect to any of Fred Zain's cases." On April 6, 1993, however, shortly following Colonel Buckalew's resignation, his successor, Colonel T.L. Kirk, requested further investigation by Prosecutor Forbes.

On June 2, 1993, following such investigation, Prosecutor Forbes filed a petition for extraordinary relief with the Supreme Court of Appeals requesting (1) the appointment of a circuit judge to conduct an investigation into whether habeas corpus relief should be granted to prisoners whose convictions were obtained through questionable forensic evidence and (2) the appointment of an independent forensic expert to conduct a thorough

1. This report addresses only the effect of any irregularities in the serology division on the validity of convictions obtained pursuant to its involvement. The investigation did not address either the potential civil liability of the State or the criminal responsibility of former West Virginia Trooper Fred Zain as the result of any irregularities. Consideration is being given to a recommendation, *inter alia,* that the Supreme Court direct the Division of Public Safety to have its Criminal Identification Bureau accredited by the American Society of Crime Laboratory Directors. It is anticipated that a final report will be issued by early December addressing this recommendation.

2. The chronology of events which resulted in the settlement is set forth in the Petition for Extraordinary Relief filed with the Supreme Court of Appeals on June 2, 1993, by William C. Forbes, Prosecuting Attorney for Kanawha County.

3. In deposition testimony taken in connection with this investigation, Smith was asked whether this conclusion included the Woodall case. Smith replied that, in his view, the Woodall case was not an "inclusion/exclusion" problem because the serology evidence did not exclude him as a suspect. The only problem, in Smith's view, was that the strength of the serology evidence was significantly overstated.

investigation of the serology department at the Division of Public Safety. On June 3, 1993, Chief Justice Margaret L. Workman entered an administrative order recalling the undersigned to supervise an investigation of the serology department at the Division of Public Safety.

On June 16, 1993, pursuant to the administrative order, Alexander Ross, Coordinator of the West Virginia Prosecuting Attorneys Association, was appointed special prosecutor to represent the State of West Virginia, and George Castelle, Chief Public Defender of Kanawha County, was appointed public defender to represent in this investigation prisoners whose convictions might be affected. An order was also entered directing the transfer of documents in the possession of the Commission on Special Investigation to the Clerk of the Supreme Court of Appeals. These documents consisted of original and photocopy records maintained in the serology department of the Division of Public Safety during the period in which Zain served as director.[4] A further order was entered placing these materials under seal, subject to inspection by the special prosecutor, the public defender, their designates, or any other person pursuant to subsequent order.

On June 17, 1993, it was determined that the records reflected 133 cases in which Zain had made positive identification of either the suspect or the victim.[5] A list of these indi-

viduals was forwarded to Nicholas J. Hun, Commissioner of the Division of Corrections, with a request to conduct a comparison with his records. On June 22, 1993, Commissioner Hun responded, identifying 21 prisoners at the West Virginia Penitentiary, 7 prisoners at the Huttonsville Correctional Center, five prisoners at the Pruntytown Correctional Center, and 5 parolees, in whose cases serology department records indicated that Zain had made a positive identification. Commissioner Hun further identified 24 individuals for whom additional information was needed, such as a social security number, date of birth, or county of conviction, in order to complete his investigation. Later, after this information was secured, 1 additional prisoner at the West Virginia Penitentiary, 1 additional prisoner at the Huttonsville Correctional Center, and 2 additional parolees were identified. The attorney for one prisoner whose name did not appear on the original list submitted a letter noting that Zain had offered inculpatory testimony at trial. Finally, during his visit to the West Virginia Penitentiary, many other prisoners whose names were not on the original list indicated to the public defender that Zain participated in their prosecutions.[6]

On June 23, 1993, an order was entered appointing the American Society of Crime Laboratory Directors/Laboratory Accreditation Board [ASCLD],[7] and Barry Fisher, Chairman of the Laboratory Accreditation

---

4. Initially, it was represented that Zain served as the director of serology from 1986–1989. Consequently, the records reviewed covered only this period. It later became evident, however, that Zain actually directed the operations of the serology department as early as 1979 and was involved in rendering his expert opinion in West Virginia criminal prosecutions after his departure in 1989.

5. As previously noted, these cases were drawn from records of cases processed in the serology department during the period of 1986–1989.

6. Additional prisoners continued to contact the public defender during the course of the investigation to indicate that Zain had been involved in their prosecutions.

7. The American Society of Crime Laboratory Directors, a national association, has established a voluntary Crime Laboratory Accreditation Program in which any crime laboratory may partici-

pate in order to demonstrate that its management, operations, personnel, procedures, instruments, physical plant, security, and safety procedures meet certain standards. These standards, which are incorporated into an Accreditation Manual, represent the consensus of the members of ASCLD. For example, the two major requirements for ASCLD/LAB accreditation include (1) periodic, internal case report and case note review and (2) proficiency testing in which blind and/or open samples of which the "true" results are unknown to the examiner prior to the analysis. State police laboratories which have received ASCLD/LAB accreditation include the Illinois State Police, the Arizona Department of Public Safety, the Washington State Patrol, the Missouri State Highway Patrol, the Michigan State Police, the Oregon State Police, the Texas Department of Public Safety, the North Carolina State Bureau of Investigation, the Virginia Bureau of Forensic Sciences, the Florida Department of Law Enforcement, the Wisconsin State Crime Laboratory, and the Indiana State Police.

Board, to conduct a preliminary investigation, using such qualified personnel as it deemed appropriate under the circumstances. On July 19, 1993, James McNamara, Laboratory Director of the Florida Department of Law Enforcement, and Ronald Linhart, Supervisor of Serology in the Crime Laboratory for the Los Angeles County Sheriff's Department, began their investigation into the policies, procedures, practices, and records of the serology department during the period Zain served as its director. They were directed to focus their efforts on 36 cases involving individuals initially identified by the Division of Corrections and who are currently incarcerated. They examined the laboratory practices in the serology division, laboratory case files, laboratory records, and trial testimony by Zain in selected cases.

On July 23, 1993, the ASCLD team concluded its investigation and on August 6, 1993, filed its report. Following a meeting with the ASCLD team on July 23, 1993, an order was entered on July 29, 1993, directing the preservation of evidence in 70 cases in which Zain was alleged to have been involved. A copy of this order was sent to every circuit clerk in the State, with directions to forward a copy to every prosecuting attorney, court reporter, and law enforcement agency in the county. A further order was entered the same day, directing the preservation of all records of testing by the serology division of the state police crime laboratory by Zain or performed under his supervision. Later, orders were entered directing the preservation of evidence in another 64 cases in which Zain was alleged to have been involved, for a total of 134 cases.

After analyzing the ASCLD report, the special prosecutor and public defender were authorized to take depositions of former and current employees of the serology lab. On September 2, 1993, depositions were taken from Lynn C. Inman Moreland, employed in the serology lab from 1978 through 1986; Sabrina Gayle Midkiff, employed in the serology lab from 1978 through 1987; Howard

Brent Myers, employed in the serology lab since 1986; and Jeffrey A. Bowles, employed in the serology lab since 1988. On September 22, 1993, depositions were taken from Ted A. Smith, employed in the serology department since 1985 and its director since Zain's departure; Bernard Dale Humphreys, employed in the personnel department at Public Safety since 1985; Gary Allen Wick, employed as director of internal affairs at Public Safety since 1988; David L. Lemmon, employed in internal affairs from 1983 to 1987; Robert Scott White, founder of the serology division at the State Police Crime Laboratory in 1964 and director of the crime laboratory from 1990 to 1992, when he retired; Kenneth Wayne Blake, director of the State Police Criminal Identification Bureau, which encompassed the State Police Crime Laboratory, from 1985 to 1988; Larry Lee Herald, director of the State Police Criminal Identification Bureau, from 1977 to 1985; and Kevin H. McDowell, a State Police employee who conducted an internal investigation in 1985. Several invitations were extended to former State Police serologist Fred S. Zain to offer testimony regarding the allegations of misconduct. His attorney initially advised that although Zain would submit to an informal interview, he would not answer any questions under oath.[8] It was determined that unsworn testimony by Zain would not further the goal of the investigation to uncover the truth about his conduct during his tenure in the serology department.

Moreland and Midkiff testified that Zain became their supervisor in 1979 or in the early 1980s. They testified that during their employment, particularly in the later years, they observed Zain recording on his worksheet results from enzyme test plates which appeared to them and to other employees, including State Police Officer Blake, Zain's supervisor, to be blank. Midkiff estimated that she had observed at least 100 instances of such conduct, stating such occurrences became routine over the years and were known in the other divisions of the State Police crime lab. She could not, however, remember the identity of any specific case in

8. Later, in a letter dated September 17, 1993, Zain's attorney withdrew his offer to submit to an unsworn interview.

which this occurred. Midkiff also testified that it appeared to her that the results found by Zain in such cases appeared to be consistent with results from tests of known samples from the suspect or the victim, thereby inculpating the suspect.[9] Both Moreland and Midkiff testified that they had written a letter reporting these incidents to Herold and Blake, but that no action was taken.[10] Moreland and Midkiff also testified that they showed the blank plates and Zain's worksheets to Zain's supervisors, but nothing was done.[11] Midkiff further attributed her transfer from the serology lab and demotion to the fact that she reported Zain for taking away hair samples she had been requested to test.[12]

Myers and Bowles testified that when they went to work in the serology lab, no one told them of any problems with Zain's work or with the reporting of results. Neither testified that they had ever seen Zain's report results from a blank plate, although they agreed that he sometimes reported findings that they would not have. Both attributed these differences in opinion to the fact that Zain had more laboratory experience. Myers did testify that after Zain left the serology lab, he rewrote one of Zain's reports because he disagreed with its conclusions. Myers also testified that after he had been unable to find blood on a murder suspect's

jacket, it was sent to Texas, where Zain found a bloodstain which tested consistent with the blood of the victim. In addition, Bowles testified that at some point he began to have doubts about whether all of the tests for which results were reported by Zain had been actually performed, based primarily on his perception that a large number of tests appeared to have been done in a short period of time. Bowles also testified that at least twice after Zain left the lab, evidence on which Bowles had been unable to obtain genetic markers was subsequently sent to Texas for testing by Zain, who again was able to identify genetic markers.[13]

Smith, who became employed in the serology department after the departure of Moreland and Midkiff, testified that prior to his 1992 audit of Zain's work,[14] he was unaware of any complaints regarding misconduct on the part of Zain. He testified that Zain, as his supervisor, never requested him to report results with which he disagreed. He further testified that he was never asked to report that tests had been performed when they had not been performed. Smith did testify, however, that after Zain left the department, problems began to surface with Zain's work.[15] For example, after his departure to Texas, Zain was asked to retest evidence and would report findings inconsistent with those of the serology department.[16] In preparing

**9.** This testimony is consistent with the observations of the ASCLD team that, when in doubt, Zain's findings would always inculpate the suspect.

**10.** Officials at the Division of Public Safety testified that no such letter was ever received and neither Moreland or Midkiff could produce a copy.

**11.** Although Moreland and Midkiff testified that Zain criticized them for being too conservative, both agreed that Zain never tried to force them to make false reports, never tried to override or change their reports, and never asked them to testify to results with which they disagreed.

**12.** Midkiff testified that her personnel records reflect other reasons for her demotion and transfer.

**13.** Myers and Bowles testified that Zain never attempted to force them to change results or report results that they did not agree with, did not try to get them to testify falsely or contrary to

their findings, and did not, as far as they knew, fabricate evidence.

**14.** Smith testified that the audit was prompted by the Woodall settlement.

**15.** Smith further testified that after he became director of the serology department, he changed several procedures in order to improve the quality of the testing being performed. For example, the department began quantifying the amount of seminal fluid tested, which Smith testified is helpful in interpreting serological observations. Smith did testify, however, that, to the best of his knowledge and belief, the testing procedures used in the serology department during Zain's tenure were in conformance with contemporary principles of forensic testing.

**16.** After Zain left the serology department, in spite of concern regarding his work, he was requested to perform forensic analysis in cases in which he was not involved prior to his departure.

for trial, serology department employees were occasionally unable to match Zain's reports to laboratory notes prepared when testing was performed. Smith testified that, eventually, the employees in the serology department became so concerned with the validity of Zain's reports, they refused to testify in the cases involved in those reports.[17] Despite these problems, Smith testified that he was deeply disturbed[18] when, as the result of the 1992 audit, he discovered evidence that Zain had falsely reported results on worksheets that could not be supported by data on the laboratory notes, including falsely reporting that testing had been performed on multiple items, when only a few had been tested, and falsely reporting that multiple genetic markers had been identified, when only a few had been identified.[19] Smith also discovered what appeared to be material alterations to laboratory notes by Zain. As with the ASCLD investigation, Smith discovered improprieties in every case he reviewed in which Zain had been involved.

Humphreys testified that he could not locate the Moreland and Midkiff letter in Zain's personnel file.[20] He further testified, however, that it was possible that it had been retained by one of Zain's supervisors and that, because the matter was resolved without the superintendent's involvement, the letter was never placed in Zain's personnel file.

> One of the reasons this occurred, according to Smith's testimony, was that several prosecutors expressed dissatisfaction with the reports they were receiving from serology and specifically requested that the evidence be analyzed by Zain.

17. Consequently, Zain continued to testify in cases in which he was involved prior to his departure.

18. Specifically, Smith testified that, "I saw my whole world crumbling. That was just my first response, I thought, 'Gosh, I just can't believe this. I just can't believe it.' I would go into the Lieutenant's office, and I'd go in and I'd shake my head, 'I just can't believe it,' because I didn't see a reason for it."

19. Although Smith admitted that it was theoretically possible that Zain had performed additional testing without anyone's knowledge to support Zain's reports that such testing had been performed or genetic markers had been identified, Smith testified that such testing would have ordi-

Humphreys finally testified that, other than Zain himself in 1988, no one had reviewed Zain's personnel file for several years.

Lemmon testified that he was aware only of problems of a personal nature that Moreland and Midkiff had with Zain. Lemmon further testified that although the results of any internal investigation regarding Zain's misconduct or incompetence should have been on file and that he was aware that an internal investigation had been conducted, he could not explain why a file could not be located in internal affairs.

McDowell testified that the internal investigation he conducted at the direction of Blake, Zain's supervisor, was precipitated by emotional problems suffered by Midkiff, allegedly caused, in part, by her conflicts with Zain. McDowell stated that, as a part of the Midkiff investigation,[21] he contacted FBI officials, who indicated that Zain "apparently doesn't like to do things by the book."[22] Finally, McDowell's investigation, he noted, was primarily directed at Midkiff and not Zain.

Wick located a letter in the Midkiff investigation file from Blake, who was then Zain's supervisor, dated March 18, 1985, to Kenneth W. Nimmich, Assistant Section Chief, Federal Bureau of Investigation Academy, Quantico, Virginia, which stated:

narily been documented in some fashion, which had not been done.

20. Teresa L. Sage, an assistant attorney general assigned to the West Virginia State Police, submitted a letter indicating that a search of the laboratory's general correspondence files also failed to disclose this letter.

21. Unquestionably, the primary focus of McDowell's investigation was Midkiff. Only after Midkiff's allegations against Zain did McDowell pursue what can best be described as an inquiry into those allegations. It is fairly clear that at no time did anyone consider the focus of the investigation to be Zain.

22. Specifically, in notes apparently taken by McDowell during telephone conversations with FBI instructors, he recorded, "Jim Mudd & Jim Kearney found Fred amusing made comments like Fred does not do things by the book etc. don't see how you can work with him."

In regard to your telephone conversations with Trooper K.H. McDowell reference an internal investigation being conducted within our laboratory, I request any information such as grades, practical examinations, attitudes, abilities etc., that you can provide regarding T/Sergeant F.S. Zains attendance at the schools he attended at the FBI Academy.

This is an internal investigation being conducted within our organization and any information obtained will only be used for an internal investigation of *allegations of misconduct and incompetence on one of the members assigned to the Serology section of our laboratory.*

F.S. Zain attended two (2) courses relating to serology on the following dates: (1) March 13–25, 1977, (2) October 22–November 4, 1978.

Thank you for your cooperation.

(Emphasis supplied). Despite the existence of this letter in the Midkiff investigation file, however, Wick testified that he could locate no complaints or other evidence regarding any internal investigation of Zain during his tenure in the serology department. Wick further testified that he could not find a copy of the letter allegedly written by Moreland and Midkiff to Zain's supervisors regarding allegations of his misconduct.

White testified that although he vaguely remembered both Moreland and Midkiff complaining that Zain was reporting results from tests they performed which varied from their interpretations, he could not remember any of the specifics. He further remembered conversations with Zain in which he accused Moreland and Midkiff of incompetence.

White testified that he did not recall seeing a letter from Moreland and Midkiff complaining about Zain's misconduct and incompetence. White did remember, however, that an inquiry into Zain's work had been conducted and that White had been directed by Blake to contact the FBI instructor who had taught a serology course Zain attended. White further recalled being told by the FBI instructor that Zain "did well below the class average." With respect to this inquiry, White also recollected that the officer in charge had told him that he had recommended to Zain's supervisors that allegations of Zain's misconduct and incompetence should be pursued further. Other than this series of events, however, and other than general statements that Zain was "pro-prosecution" and complaints of a personal, as opposed to a professional, nature, White stated that until the 1992 audit commenced in the wake of the Woodall settlement, he could not recall other allegations of misconduct or incompetence.[23] Finally, White, who assisted Smith in conducting the 1992 audit, corroborated Smith's testimony regarding the results of the audit.[24]

Although he recalled their personal squabbling with Zain, Herald disputed Moreland and Midkiff's contention that they had complained to him that Zain was reporting results from blank plates. Herald also disputed Moreland and Midkiff's contention that they had sent a letter to Herald complaining about Zain's misconduct and incompetence. Herald testified that although, as director of the Criminal Identification Bureau, the serology department was under his supervision, he had no knowledge of the field of serology

---

**23.** In his deposition testimony, Smith also referred to Zain as "very pro-prosecution," and opined that part of the tension between Midkiff and Zain resulted from her more conservative approach to interpreting test results. For example, Smith stated, "[T]here's always going to be test results that are weak and we have to decide whether we think they are acceptable to call. Typically, Gayle [Midkiff] would say, no, I think they are too weak. I'm not going to call them unless I can duplicate them, as Fred [Zain] may take the approach go ahead and call them[,] based on my experience, I think you can make the call."

**24.** White also testified that, following the 1992 audit, Superintendent Buckalew instructed him to contact serologists outside West Virginia about conducting an additional investigation. White stated that although he contacted serologists in Florida, Indiana, and North Carolina, they were either unable or unwilling to conduct such investigation. This testimony was corroborated by Smith, who explained that one reason the issue of an outside investigation was not pursued further was due to Superintendent Buckalew's departure.

and stated that he relied on Blake to properly supervise the department.[25]

Blake, like Herald, recalled personal problems between Moreland, Midkiff, and Zain, but disputed that Moreland and Midkiff had complained to him that Zain was fabricating results. He further disputed their assertion that they had written a letter to him complaining about Zain's misconduct and incompetence. He stated, "[I]f they had come to me ... and said that there was somebody fabricating evidence, oh, Lord, I think the whole roof would have come off this building.... I assure you that if there had been a problem with evidence ... Zain would have been fired...." Blake was unable to explain, however, why the investigation of Midkiff's emotional problems included contacting the FBI regarding Zain's integrity and professional competence. When asked about the FBI's response, Blake admitted that he recalled negative comments regarding Zain's competence, but that he was later assured by another officer that Zain was competent.[26]

Although the testimony of the former and current employees of the Division of Public Safety and the serology department was conflicting, it generally supports the findings of the ASCLD report with respect to Zain's conduct. Without question, as Blake's letter to the FBI indicates, an investigation of another officer in serology was conducted in 1985 which included allegations of misconduct and incompetence on the part of Zain. Whether this inquiry into Zain was prompted by a letter or oral communication is irrelevant. It also appears from the testimony that Zain consistently interpreted marginal or nonexistent scientific evidence as inculpatory. It further appears, from the audit conducted by Smith and White, that serology department records conclusively establish that Zain falsely reported that testing had been performed when it had not been performed and falsely reported results stronger than those which testing had actually reflected.[27] Whether Zain reported findings from blank plates is unclear, but almost everyone who worked with him agreed that he often reported findings with which they disagreed and that those findings consistently inculpated the suspect.

It appears that Zain was quite skillful in using his experience and position of authority to deflect criticism of his work by his subordinates. Evidence regarding whether Zain's supervisors ignored or concealed complaints of his misconduct is conflicting and the issue beyond the scope of this investigation. For the purposes of this investigation, it is sufficient that the deposition testimony provides additional evidence of the allegations of misconduct on the part of Zain.

25. In fact, Herald testified in response to a question regarding whether Moreland and Midkiff had shown him how Zain was reporting results from blank plates, "They [might as] well have shown me a page of Chinese arithmetic. I wouldn't have understood that anyway."

26. With respect to its overall operation, Blake testified that, "We ran the laboratory on a shoestring budget, and we went through some very lean years." For example, although Blake wanted periodic proficiency testing of his technicians, he testified that his budget did not permit such testing as frequently as he would have liked.

27. It further appears that Zain may have testified falsely concerning his academic credentials. In *State v. William E. Smith*, Raleigh County Criminal Action No. 85–F–43, Zain testified that, "My educational background is that I have a Bachelor of Science degree in Biology *with a minor in chemistry*." [Emphasis supplied]. The undergraduate transcript which appears in his personnel file reflects a major in biology, but no entry appears under the designation "minor." The transcript further reflects that although Zain registered a total of nine times for chemistry courses, his academic record was less than stellar. He received an "F" in Organic Chemistry and only received a "D" when he later took the course. He received a "D" in Organic Chemistry Lab and, after withdrawing from an earlier course, received a "C" in General Chemistry. In addition to this grade of "C" in the three-hour General Chemistry course, Zain received a "B" in a two-hour chemistry course entitled "Qualitative Analysis," a "B" in a three-hour course entitled "General Chemistry Qualitative Analysis," and an "A" in a two-hour course entitled "Quantitative Analysis." Thus, it appears that Zain had only 10 hours of chemistry courses in which he received a grade of "C" or above. In addition to his rather poor performance in most of his chemistry courses, Zain's transcript reflects an "F" in Zoology, in which he later received a "C," a "D" in Botany, a "D" in College Algebra, and a "D" in Genetics.

**336**

## FINDINGS OF FACT

The ASCLD report identifies multiple incidents of misconduct on the part of former State Police serologist Fred Zain.[28] The deposition testimony of fellow officers in the serology department during Zain's tenure lends additional support to the ASCLD findings.

The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results. Moreover, the ASCLD team concluded that this misconduct was "the result of systematic practice rather than an occasional inadvertent error." [29]

Some of the ASCLD comments on specific cases reviewed are illustrative of the types of activity in which Zain engaged. They raise the distinct possibility that Zain's pattern of misconduct may have resulted in serious miscarriages of justice in cases in which he was involved. In *State v. Gerald Wayne Davis*, the report states, "The reported results showed an ABO type foreign to both victim and defendant. The remaining marker was identical to the victim. This would normally be interpreted as *excluding* defendant as the semen donor. The report incorrectly implied a match between the semen and the defendant. The ABO mismatch was dismissed as bacterial contamination by Mr. Zain. However, no satisfactory foundation for that opinion was found in the laboratory records nor the transcript of testimony. If the ABO result is discounted, the correct conclusion is no information regarding the semen donor." [Emphasis added]. In *State v. David McDonald*, the report states, "[M]any of the samples gave no results with some markers, but a result was listed on the worksheet. ABO types were listed for all samples on the worksheets. However, no ABO typing was found for this case in the data sheets." In *State v. Robert Parsons*, the report states, "The enzyme typing on blood on an orange towel . . . gave results consistent with the victim, excluding the defendant. This was run four times, as reflected on the data sheets, with equivalent results. The ABO type was run once and gave a result consistent with the defendant, excluding the victim. . . . The final report attributed the blood to the defendant based on ABO type

**28.** The qualifications of the members of the ASCLD team are excellent. James J. McNamara, with over 15 years forensic serology experience, has been Bureau Chief/Special Agent of the Florida Department of Law Enforcement, Orlando Regional Crime Laboratory, since 1988. In addition to a Master of Public Administration from the University of Central Florida, a Master of Science in Criminal Justice from Rollins College, and a Bachelor of Science in Forensic Science from the University of Central Florida, Mr. McNamara has attended many graduate courses and seminars in the field of forensic science, holds several memberships in state and national forensic science associations, and has testified in numerous trials at both the state and federal level in the State of Florida. Ronald R. Linhart, with over 20 years forensic science experience, has been Supervising Criminalist in the Los Angeles County Sheriff's Department since 1988. In addition to a Bachelor of Science in Chemistry from the University of California at Riverside, Mr. Linhart has attended graduate courses at UCLA and California State at Los Angeles, has participated in numerous training programs, including ones conducted by the Federal Bureau of Investigations, the American Medical Association, and the California Department of Justice, and has offered expert testimony in over 400 cases.

**29.** The ASCLD team reported, "Irregularities were found in most of the cases reviewed in this investigation . . ." Although the ASCLD team acknowledged, "The time available for this investigation prohibited an in depth review for most of the relatively large number of cases presented," it further stated, "We recommend a more thorough technical review of individual cases in which the irregularities may have had a significant impact on pleas or convictions."

only. The enzymes were not reported. This appears to be an incorrect attribution of donor of the blood on the towel." In *State v. Darrell Lee White*, the report states, "All items were listed together on the report of typing results implying, incorrectly, that all typing markers gave results for all items. No incorrect attribution appears to have been made, but the weight of the match was overstated." In *State v. Thomas Sayre*, the report states, "This was a sexual assault case in which the typing results were identical to the victim. The reported conclusion was ambiguous but implied a match with the defendant. The report should have stated no information on the semen donor." In *State v. Dale S. O'Neil*, the report states, "Some samples critical to the final conclusion reflected a difference between the worksheet and the data sheet, with the data sheet reflecting the victim's type and the worksheet reflecting a mixture which included the defendant. The worksheet showed evidence of alteration." In *State v. Ronald Bennett*, the report states, "ABO grouping test results ... indicated A, B, and O activity on a napkin ... yet the result was reported as 'A.' Data sheets also showed one enzyme type ... to be not callable on the napkin, yet it was reported.... Another enzyme ... was shown in parentheses on the data sheets which usually meant inconclusive, yet it, too, was called.... The data in this case does not support the attribution of donor stated in the case report." In *State v. Micah D. Truitt*, the report states, "[The] data sheet showed 'O' activity on a knife ... yet the report stated that ABO 'A' was found on the knife. It also showed '635 Jkt R Sleeve' with 'O' activity, but this was not reported at all. There appears to be an incorrect attribution of donor." In *State v. James E. Richardson*, the report states, "There was no evidence that Lewis testing was performed on the swab, but the report implies that it was. The

conclusion did not include any frequency, but a transcript was reviewed to see how these results were explained in court by Mr. Zain. He incorrectly multiplied the non-secretor frequency ... by 50% since the stain included semen (from males only) and finally by the PGM 1+ frequency, even though there may have been masking by the victim's PGM type. That the semen could not have originated from a secretor based on the absence of any blood group factors is not a certainty as stated in his testimony.... The value of the serological testing was overstated in both the report and the testimony."

The ASCLD report also criticized certain operating procedures of the serology division during Zain's tenure, which undoubtedly contributed to an environment within which Zain's misconduct escaped detection. These procedural deficiencies included (1) no written documentation of testing methodology; (2) no written quality assurance program; (3) no written internal or external auditing procedures; (4) no routine proficiency testing of laboratory technicians; (5) no technical review of work product; (6) no written documentation of instrument maintenance and calibration; (7) no written testing procedures manual; (8) failure to follow generally-accepted scientific testing standards with respect to certain tests; (9) inadequate record-keeping; and (10) failure to conduct collateral testing. Although the ASCLD investigators have concluded that these procedural deficiencies appear to have been rectified and do not seriously undermine the validity of testing performed by other technicians in the serology department during Zain's tenure, they demonstrate the danger of relying on forensic evidence analyzed in a laboratory without a proper quality assurance program.[30]

The overwhelming evidence of a pattern and practice of misconduct by Zain completely undermines the validity and reliability of

---

30. The ASCLD team has noted, in a letter submitted following submission of its report, these procedural deficiencies "limit the ability to assess the reliability of analytical results." A comprehensive quality assurance program, therefore, is not only critical to ensuring appropriate testing and reporting methodology, it is crucial to properly reviewing previous work to determine

its reliability. In this regard, the ASCLD team further observed, however, that "many forensic laboratories in this country developed and documented their quality assurance programs during the 1980s. West Virginia was undoubtedly not unique in not having such programs in place in the review period."

any forensic work he performed or reported during his tenure in the serology department of the state police crime laboratory. If the information which is now available concerning the pattern and practice of misconduct by Zain had been available during the prosecution of cases in which he was involved, the evidence regarding the results of serological testing would have been deemed inadmissible.

## CONCLUSIONS OF LAW

The findings of fact made in this report constitute newly discovered evidence. In deciding whether newly discovered evidence in a criminal prosecution warrants the award of a new trial, five factors are considered: (1) whether the evidence was discovered since trial; (2) whether, through the exercise of due diligence by trial counsel, the evidence should have been discovered prior to the conclusion of trial; (3) whether the evidence is not merely cumulative, but provides insights not apparent from the evidence adduced at trial; (4) whether the evidence ought to produce a verdict of acquittal at a second trial; and (5) whether the evidence would merely serve to impeach a prosecution witness. Syl. pt. 1, *State v. O'Donnell,* [189] W.Va. [628], [433] S.E.2d 566 (1993); Syl. pt. 1, *State v. King,* 173 W.Va. 164, 313 S.E.2d 440 (1984); Syl., *State v. Frazier,* 162 W.Va. 935, 253 S.E.2d 534 (1979); Syl. pt. 2, *State v. Stewart,* 161 W.Va. 127, 239 S.E.2d 777 (1977); Syl. pt. 10, *State v. Hamric,* 151 W.Va. 1, 151 [S.E.2d] 252 (1966); Syl., *State v. Farley,* 143 W.Va. 445, 104 S.E.2d 265 (1958); *State v. Spradley,* 140 W.Va. 314, 325–26, 84 S.E.2d 156, 162 (1954) (collecting cases). Due to the nature of these factors, the Court has noted, " 'A new trial on the ground of after-discovered evidence or new discovered evidence is very seldom granted

and the circumstances must be unusual or special.' Syllabus Point 9, *State v. Hamric,* 151 W.Va. 1, 151 S.E.2d 252 (1966)." Syl. pt. 2, *State v. King, supra.* On occasion, however, it has awarded a new trial in a criminal case on the basis of newly discovered evidence. In *State v. O'Donnell, supra,* for example, the Court awarded a new trial based upon a letter to the defendant from the alleged victim of a sexual assault that recanted her story that the group sex which served as the foundation for the prosecution was involuntary. *Id.* at 638–39, 433 S.E.2d at 571–72. In *State v. Stewart, supra,* involving allegations of police misconduct, the Court also awarded a new trial where an informant testified "that the reports from which [the trooper] derived his testimony were routinely altered and falsified." 161 W.Va. at 141, 239 S.E.2d at 785.

Although there is no authority in West Virginia directly involving false testimony by a prosecution expert, the issue has been addressed in other jurisdictions. As a general rule, courts have held that where newly discovered evidence indicates that an expert witness committed perjury or gave wilfully false testimony during the trial, a new trial will be awarded only where such evidence would probably produce a different result. *Perjury or Wilfully False Testimony of Expert Witness as Basis for New Trial on Ground of Newly Discovered Evidence,* 38 A.L.R.3d 812 (1971). In *State v. Coleman,* 193 Neb. 666, 228 N.W.2d 618, 619 (1975), for example, where the newly discovered evidence consisted of a showing that a prosecution expert had testified falsely regarding his academic qualifications, the Nebraska Supreme Court refused to award a new trial, concluding that the expert's background and training, excluding the questionable academic credentials, were sufficient to qualify him as an expert witness.[31] On the other hand, in

---

**31.** Similarly, in *State v. Hamilton,* 791 S.W.2d 789, 794 (Mo.App.1990), where the state's serological expert admitted subsequent to trial that his trial testimony that the defendant was within the 61% of the male population who could have committed a rape was incorrect, but that any male could have committed the crime, the court refused to award a new trial, stating that, "While the latter testimony is marginally in appellant's favor, the practical import of both is the same: neither test exonerates the appellant and neither

test clearly implicates him." *See also People v. Lovitz,* 127 Ill.App.3d 390, 82 Ill.Dec. 356, 468 N.E.2d 1010 (Ill.App.1984) (defendant not entitled to new trial due to revised opinion of prosecution's firearms expert after he discovered design defect in gun, because other significant evidence indicated guilt); *Trotter v. State,* 736 S.W.2d 536 (Mo.App.1987) (defendant not entitled to a new trial where prosecution's firearms expert changed opinion subsequent to trial re-

*State v. DeFronzo*, 59 [Ohio] Misc. 113, 394 N.E.2d 1027, 1034 (1978), where the newly discovered evidence demonstrated that the prosecution's expert, a police laboratory technician, had falsified not only his academic credentials, but had also testified falsely regarding his training and experience in the fields of drug testing, firearm testing, and handwriting analysis; his performance of certain chemical tests on the drugs involved in the prosecution; and his performance of tests on a firearm involved in the prosecution, the court awarded a new trial.[32]

A careful review of the newly discovered evidence in this case reveals that four of the five elements for the award of a new trial are present. This evidence was obviously discovered since trial. Although some of this evidence could have been discovered by diligent trial counsel, much of it, particularly regarding misconduct by Zain, could not have been reasonably discovered.[33] The evidence is not cumulative, but would have injected a new element in the trial—the intentional falsification of evidence by the prosecution's expert forensic witness.[34] Finally, the evidence goes well beyond mere impeachment evidence, but strikes at the heart of the integrity of the State's case in every prosecution in which Zain was involved.[35] Only the fourth element—whether, excluding the serological evidence, the other evidence adduced at trial would have been sufficient to sustain a conviction beyond a reasonable doubt—remains in doubt.

In order to ascertain whether this newly discovered evidence regarding Zain's misconduct warrants the award of a new trial, the forensic evidence must be analyzed in light of the other evidence of guilt in each of the cases in which he was involved. For example, where the defendant admitted intercourse with the prosecutrix, but asserted that sexual relations were consensual, forensic evidence regarding the source of semen would ordinarily be collateral, and a new trial may not be warranted. On the other hand, where the prosecutrix was unable to identify the defendant as her assailant, but serological evidence identified the defendant as the source of semen found on the victim's undergarments, and the defense was alibi, a new trial may be warranted. Accordingly, in order to determine whether a new trial should

garding the type of gun used in the murder of a police officer where there was no attempt at trial to connect the defendant with the gun).

**32.** Similarly, in Syl. pt. 1 of *State v. Caldwell,* 322 N.W.2d 574 (Minn. [1982]), the Minnesota Supreme Court held, "Appellant is entitled to a new trial where the uncontroverted testimony of the state's fingerprint expert, which was the only significant evidence tending to establish where he was when the murders of which he was convicted were committed, is subsequently discovered to have been incorrect."

**33.** In fact, one of the problems in the serology department at the state police crime laboratory during Trooper Zain's tenure as director was that his subordinates were discouraged or prevented from challenging his authority, and none of Trooper Zain's supervisors had the expertise to monitor his activities.

**34.** In addition, the absence of comprehensive internal operating procedures in the serology division, a condition apparently inadequately explored by defense counsel in prosecutions in which serological evidence was a factor, could have influenced the weight given such evidence by a jury. As the Court recently noted, for example, in Syllabus Point 2 of *State v. Thomas,* 187 W.Va. 686, 421 S.E.2d 227 (1992), "There is nothing inherently unreliable in statistical evidence based on blood-typing and enzyme tests. First, blood tests themselves are reliable *when properly conducted,* and these tests are valuable only when their results are placed in the context of statistical probabilities." Consequently, if blood tests are not properly conducted, any statistical conclusions drawn therefrom are inherently unreliable. Statistics can have the unfortunate quality of lending an appearance of legitimacy to questionable scientific conclusions or, as the Court stated in *Thomas, supra* at 691, 421 S.E.2d at 232, "[P]suedo-science is eminently convincing because it is accompanied by all the mumbo-jumbo of real science."

**35.** In *State v. DeFronzo,* 59 Ohio Misc. at 122–23, 394 N.E.2d at 1033, the court stated, "The court can conceive of no infringement which is more serious than the lying of a police officer which substantially contributes to the conviction and loss of freedom of a defendant.... The court is perplexed as to why the State is satisfied to have the conviction stand under such circumstances. The State seems to fail to realize that its highest duty to the people of the State of Ohio is the participation in the system's quest for justice. The word justice is not synonymous with the word convictions."

be granted to defendants in whose cases in which Zain rendered an inculpatory report or offered inculpatory testimony, it will be necessary to analyze the effect of such involvement in individual prosecutions.

## RECOMMENDATIONS

Due to the undisputed nature of the overwhelming evidence of misconduct on the part of Zain, both the special prosecutor and public defender agree that it would not be in the interest of judicial economy to litigate whether his serological work should be subjected to scrutiny in individual cases. It is believed that, as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding. The only issue in any habeas corpus proceeding would be whether the evidence presented at or prior to trial or prior to the entry of a guilty plea, independent of the forensic evidence presented by Zain, would have been sufficient to support the verdict or plea.

Due to many factors, including inadequate record-keeping by the serology department, it is impossible to ascertain, with any degree of certainty, the identity of every case in which Zain may have been involved. Therefore, it is recommended that the Division of Corrections be directed to inform all prisoners and parolees of their right to file a petition for post-conviction habeas corpus with the Supreme Court of Appeals if Zain was involved in their prosecution and rendered an inculpatory report or offered inculpatory testimony.[36] If the Supreme Court determines,

through whatever procedure it deems appropriate, that Zain was involved in a petitioner's prosecution, the Court could then issue a rule to show cause returnable before the presiding judge or in the circuit court of the county of conviction. The circuit court could then appoint counsel to represent the petitioner to ascertain (1) whether Zain was involved in the petitioner's prosecution; (2) whether Zain rendered an inculpatory report or offered inculpatory testimony; and (3) whether, excluding the serological evidence, the other evidence adduced at trial would have been sufficient to sustain a conviction beyond a reasonable doubt.

As previously discussed, orders have been entered directing the preservation of evidence in 134 cases in which Zain was alleged to have been involved. Due to recent advances in field of DNA testing, scientifically reliable results can now be obtained from samples which have significantly deteriorated. It is recommended that, as a condition to any post-conviction habeas corpus proceeding, the petitioner be required to consent to DNA testing of any available serological evidence.[37] It is further recommended that an accredited laboratory be designated by the Court to conduct all such testing. If such testing conclusively establishes the guilt of the petitioner, then further habeas corpus proceedings would ordinarily be unnecessary. If such testing conclusively establishes the innocence of the petitioner, then an order granting his or her release should ordinarily be entered. Only where such testing proves inconclusive should the full post-conviction habeas corpus review be provided.[38]

Dated: November 4, 1993

---

**36.** A sample form is attached to this report as one method of allowing prisoners to pursue post-conviction habeas corpus relief due to the involvement of Zain.

**37.** This DNA testing, of course, could have been requested by the prosecution even in the absence of this recommendation. Specific language has been included in the proposed post-conviction habeas corpus form to advise prisoners of the DNA testing requirement. Moreover, when an attorney is appointed for the petition when a case is returned to circuit court, the attorney may advise the petitioner against submission to DNA testing and to voluntarily withdraw the petition.

**38.** As a final matter, it is recommended that other than Midkiff's personnel file, Moreland's personnel file, and the McDowell investigation file, other than McDowell's notations regarding conversations with the FBI regarding Zain, the entire investigative file in this matter, including this report, the ASCLD report, correspondence, orders, transcripts, and other documents, should be made available for public inspection. It is further recommended that several copies of these materials should be made available to every correctional facility in which petitioners who seek habeas corpus review pursuant to this report are incarcerated.

/s/ <u>James O. Holliday</u>
JAMES O. HOLLIDAY
Senior Judge