**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PHILLIP A. WARD,
Petitioner-Appellant,

v.                                                              No. 98-7267

GEORGE TRENT, Warden,
Respondent-Appellee.

Appeal from the United States District Court
for the Southern District of West Virginia, at Huntington.
Robert C. Chambers, District Judge.
(CA-97-1107)

Submitted: April 27, 1999

Decided: August 23, 1999

Before ERVIN, WILKINS, and LUTTIG, Circuit Judges.

_____

Affirmed in part and dismissed in part by unpublished per curiam
opinion.

_____

**COUNSEL**

Phillip A. Ward, Appellant Pro Se. Rory Lee Perry, II, OFFICE OF
THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston,
West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

**OPINION**

PER CURIAM:

Phillip Ward appeals the district court's order denying his petition filed under 28 U.S.C.A. § 2254 (West 1994 & Supp. 1999). We deny a certificate of appealability and dismiss.

On May 3, 1987, Carol Carter, a night manager at a Wendy's restaurant in Huntington, West Virginia, was brutally murdered during a robbery of the store. According to the evidence presented at Ward's trial, Carter was working at the Wendy's restaurant during the late evening and early morning hours. Ward was also working at the store that evening. Although his shift ended at 11:30 p.m., Ward and another employee, Craig Sigler, returned to the store at midnight and knocked on the store window until Carter, recognizing them, unlocked the door and let them in. Sometime later, at approximately 12:30 a.m., Sigler and Ward left the restaurant, and Carter locked the door behind them. As Sigler pulled from the parking lot he noticed that Ward had not entered his car, but was still standing in the lot, leaning up against his car.

The next morning, a store manager arrived at the Wendy's at 5:45 a.m. and noticed that Carter's car was still in the parking lot. Inspection of the immediate area revealed a key ring with a key to the store lying on the ground near the front door. Finding the door unlocked, Wendy's representatives contacted the police and waited for their arrival prior to entering the store.

Inside the restaurant, police found a wad of blood-soaked clothing atop a food preparation table; papers scattered about the office; an empty safe; and a large amount of blood on the floor, around the safe, on the safe, in the safe, on the walls, and on the light switches. A trail of blood also ran from the kitchen area to the front of the store. An attempt had been made to wipe up part of the blood, and a female manager's tie was found entangled within a janitorial mop.

Approximately $1350 in cash, including approximately $60 in coins, was taken from the safe. Carter's body was found about forty

2

yards from the Wendy's store, near a riverbank behind an adjacent building. She had been bludgeoned to death. She was clad only in a pair of tennis shoes, the tongues of which were partially curled up in the shoes, and a windbreaker, the snaps of which were improperly fastened. The medical examiner estimated the time of death to be between midnight and 2:00 a.m., and testified that Carter could have traversed the distance from the store to the riverbank on her own prior to a final blow that resulted in an extensive fracture of her skull.

At 6:40 a.m. that same day, Karen Spoor, an employee of the Huntington Work Release Center (HWRC) saw Ward, a participant in a prison work release/furlough program through the HWRC, at an area gas station. When she asked Ward why he was not at home as required by the program, Ward responded that he had been called back into work because his employer wished to speak with him. Spoor told Ward that she had seen police vehicles at the Wendy's and instructed him to call her as soon as he left the store per HWRC regulations.

Ward did not comply with this instruction. Instead, he and his girlfriend visited a music electronics shop where, despite evidence of prior financial difficulties, Ward purchased a $219.29 car stereo system with cash, in small bills. He also paid the $52.50 installation fee in cash, drawing the amount from a large stack of bills. Ward's girlfriend thereafter visited the power company and paid off an overdue bill of $200.67 in cash. A power company employee testified that, upon inspection, several of the bills appeared to be blood-stained.

As 5:00 p.m. approached, Ward contacted the HWRC from his mother's house and was instructed to remain at the house until an HWRC administrator arrived. Following the administrator's arrival and initial questioning of Ward, Ward excused himself momentarily, and went upstairs. The investigator became suspicious when Ward did not return within a few minutes, and upon investigation of the upstairs area, discovered that Ward had fled.

Ward was apprehended shortly after this discovery, and as he was being handcuffed by correctional officers he was overheard mentioning something about his keys. In response to this statement, Ward's mother took his car keys, opened his car, and retrieved a stack of

unfolded bills approximately one half of an inch thick from a console in the front seat. When Ward was later turned over to the sheriff's office, his wallet was found to contain a five dollar bill that was blood-stained.

A backpack containing items belonging to Ward was later discovered in a garbage can next to a neighbor's house. Inside the backpack, police found approximately thirty-five one dollar bills, $60 in change, wrapped in Wells Fargo wrappers,**1** and a figurine bearing the name of Ward's girlfriend and containing an additional $740 in cash. Testimony from police serologist Fred Zain revealed that some of the money recovered from Ward and the power company was stained with blood matching that of Carter and Ward. Based on the foregoing evidence, Ward was convicted of Carter's murder and sentenced to life imprisonment without the possibility of parole.

Following an unsuccessful motion for a new trial based upon an alleged Brady**2** violation, and Ward's subsequent direct appeal, it was discovered that police serologist Zain falsified his credentials and "engaged in a pattern and practice of misconduct [that] completely undermined the validity and reliability of any forensic work he performed or reported." Matter of Investigation of W. Va. State Police Crime Lab., Serology Div., 438 S.E.2d 501, 504 (W. Va. 1993) [Crime Lab.]. As a result, the state supreme court held that all of Zain's work was presumptively invalid and that all persons convicted as a result of his testimony or work were permitted to challenge their convictions on the basis of newly discovered evidence.

Ward launched such a challenge. In review of his petition, the state court found that despite Zain's testimony that he performed the testing in Ward's case, the work was actually performed by two troopers whose work was not called into question--Smith and Myers. Accordingly, the court found that the serology evidence in Ward's case was not affected by Zain's misconduct or by his testimony at trial. In addition, the court found that even if the serology evidence was excluded, there was sufficient evidence to convict Ward of the murder. Ward thereafter filed another state habeas petition raising additional claims.

_____

**1** Wendy's change is wrapped in Wells Fargo wrappers.
**2** **Brady v. Maryland**, 373 U.S. 83 (1963).

4

Following the denial of this petition, Ward filed a § 2254 petition in federal district court. As part of this petition, Ward presented newly discovered evidence that seriously called into question the veracity and credibility of police serologist Smith. The district court noted that this claim was unexhausted, but determined that exhaustion was unnecessary because the state court had made the alternative finding that even absent the blood evidence, the evidence against Ward was sufficient. Applying the deferential standard of review set forth in 28 U.S.C.A. § 2254 (West 1994 & Supp. 1999), the district court stated that although it would have granted Ward's petition under the prior standard, it was "force[d]" to deny Ward's petition under the current standard. Specifically, the court stated:

> [D]eference has emerged as the most fundamental underlying concept of federal habeas review. The inevitable impact of such a heightened deferential standard is that the federal court's capacity to review a habeas petition is reduced to the level of a rubber stamp that must dismiss a habeas petition unless the state court's findings stretch beyond the reason of any reasonable jurist. The heightened deference standard effectively precludes the granting of a federal habeas petition even in cases where a writ would be warranted under the pre-AEDPA's non-deferential review standard. Such is the result in this case.

The district court discussed the serology claims in light of this standard and, although it found them troublesome, ultimately concluded that a reasonable jurist could agree with the state court's determination. Applying this standard to the rest of the claims, the court dismissed them without discussion, and granted the State's motion for summary judgment. Ward appeals this judgment, raising several assignments of error.

This Court reviews a grant of summary judgment de novo. See Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is properly granted when there are no genuine issues of material fact and when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All reason-

5

able inferences are to be drawn in favor of the non-moving party. See Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980).

I. Standard of review

Ward first argues that the district court erred in holding that federal courts must accord a state court's fact finding process a greater degree of deference than its interpretation of federal law, and asserts that such a holding undermines this Court's decision in Green v. French, 143 F.3d 865 (4th Cir. 1998), cert. denied, ___ U.S. ___, 67 U.S.L.W. 3436 (Jan. 11, 1999) (No. 98-7096). He is mistaken.

Section 2254 provides the following regarding a state court's factual findings:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

§ 2254(e)(1). The district court quoted this precise language in its memorandum and applied it, as written, to Ward's case. Moreover, this language, and the district court's use of it, does not conflict with this Court's holding in Green. We therefore find this claim to be without merit.

Ward next asserts that the statutorily mandated deference to state court factual findings prevents federal courts from considering the underlying procedure in which those factual findings were made. This argument again ignores the plain language of the statute, which provides that a petitioner may rebut the presumption of correctness. Arguably, one way in which this may be accomplished is by demonstrating that the state proceedings were procedurally flawed. Ward attempts to demonstrate such a flaw by arguing that the West Virginia Supreme Court of Appeals erred in setting the standard of review for the Zain/serology issues.

6

Specifically, Ward argues that the serology claim involves constitutional error, and that the state supreme court, in setting forth the standard of review for all cases raising challenges as a result of Zain's testimony, improperly employed a standard for nonconstitutional error. Review of the record and the state court's opinion in Crime Lab. reveals that the court properly recognized the constitutional significance of the issue, noting that it is a violation of due process for the state to convict a defendant based on false evidence. See Crime Lab., 438 S.E.2d at 504 (citing Napue v. Illinois, 360 U.S. 264, 269 (1959)). Drawing from Supreme Court precedent in Napue, Giglio,[3] and Brady, the West Virginia Supreme Court of Appeals determined that "it matters not whether a prosecutor using Trooper Zain as his expert ever knew that Trooper Zain was falsifying the State's evidence. The State must bear the responsibility for the false evidence. The law forbids the State from obtaining a conviction based on false evidence." Crime Lab., 438 S.E.2d at 505. The court then properly recognized that a conviction obtained on the basis of false evidence will be set aside only if it is shown that the false evidence had a material effect on the jury verdict. After examining several materiality tests, the court finally settled on the following, three-part test for reviewing courts to employ in analyzing Zain challenges:

> (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt;
>
> (2) if the remaining evidence is found to be insufficient, the error is not harmless;
>
> (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

Id. at 506.

_____

**3 Giglio v. United States**, 405 U.S. 150 (1972).

7

We conclude that the West Virginia Supreme Court of Appeals set forth the proper standards to be applied in reviewing Zain/serology claims. Regrettably, Ward's state habeas court does not appear to have applied this standard, but instead stopped at step one of the process, and determined that the remaining evidence was sufficient without ever conducting an inquiry into whether the error had any prejudicial effect on the jury. Given this error, the district court's deference to the state court's decision was arguably improper. Notwithstanding this potential error, we conclude that the district court's ultimate decision was correct.

In reaching this determination, we start from the premise that a conviction must be reversed if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976) (providing standard).[4] The Supreme Court refined this standard in Kyles v. Whitley, 514 U.S. 419 (1995), explaining that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 434. The Court further emphasized that it was not a sufficiency issue, but rather an issue of whether all of the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435. Review of the record reveals that Ward cannot meet this standard.

_____

[4] Although this Court has not explicitly stated that the "any reasonable likelihood" standard is more "defense-friendly" than the "reasonable probability" standard of Brady, most circuits have so held or suggested as much in dicta. See United States v. Steinberg , 99 F.3d 1486, 1490 (9th Cir. 1996); United States v. Gonzales, 90 F.3d 1363, 1368 n.2 (8th Cir. 1996); United States v. Alzate, 47 F.3d 1103, 1109-10 (11th Cir. 1995); Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993); United States v. O'Dell, 805 F.2d 637, 641 (6th Cir. 1986); United States v. Kluger, 794 F.2d 1579, 1582 n.4 (10th Cir. 1986); United States v. Jackson, 780 F.2d 1305, 1309 (7th Cir. 1986); but see United States v. Boyd, 55 F.3d 239, 245 (7th Cir. 1995). This Court has also suggested that the two standards might differ, see United States v. Sutton , 542 F.2d 1239, 1242 & n.3 (4th Cir. 1976), but explicitly reserved the question in United States v. Kelly, see 35 F.3d 929, 936 n.10 (4th Cir. 1994).

Recapping the permissible evidence, Ward, Carter, and Sigler were alone at the Wendy's store until approximately 12:30 a.m. on the morning of the murder. Sigler testified that he and Ward left the store together and that Carter locked the door behind them. As Sigler left the parking lot, he noticed that Ward was still standing in the lot, leaning against his car.

During the robbery, approximately $1350, including a substantial amount of change in Wells Fargo wrappers, was taken from the store. Later on that day, Ward, previously in financial distress, bought a car stereo system in cash, and his girlfriend paid off a large, overdue power bill. Following Ward's flight from HWRC authorities, a large amount of cash was also recovered from his car. A backpack, belonging to Ward, was later discovered to contain a large amount of cash concealed within a figurine belonging to Ward's girlfriend. Notably, the backpack also contained the approximate amount of change believed to have been stolen from the Wendy's store, and this change was packaged in Wells Fargo wrappers. In addition, some of the money recovered from Ward and the power company was stained with what appeared to be blood. According to the testimony of the Wendy's store manager, blood was found both on and inside the store safe. Finally, Ward's paycheck, along with those of all other store employees, was found at the Wendy's store following the murder, and thus the aforementioned cash was not received as part of his salary.

While the serology evidence was no doubt compelling, we find that the above-detailed evidence presents a clear picture of guilt beyond a reasonable doubt, and that there is no reasonable likelihood that the jury would have acquitted had it received only this foregoing account of events. See Agurs, 427 U.S. at 103. The addition of the serology evidence serves only to remove all doubt from the issue, a burden that the state need not carry in order to convict. Accordingly, we conclude that the district court's dismissal of this claim was appropriate regardless of the potential error in the state court's decision.

II. Brady violations

Ward also asserts that the district court erred in finding that he failed to present a colorable Brady violation. Ward's argument in this regard centers on the later-discovered fact that two of the bills tested

9

for blood evidence were found to contain a third blood type belonging to neither Ward nor the victim.

Review of the record reveals that Ward did not present this claim to the state courts. Although he claims that it is newly discovered evidence that he did not learn of until after filing his § 2254 petition, the state records reveal that this information was known to Ward during his state habeas petition. Accordingly, it is unexhausted, and were Ward to attempt to bring this claim now he would be barred by West Virginia law. The claim is therefore not properly preserved for federal review. Further, even were this Court to grant Ward the extraordinary relief he seeks and review this claim despite its non-exhausted status, there is no Brady violation.

A defendant must prove three elements to establish a due process violation under Brady: (1) the prosecution withheld or suppressed evidence; (2) the evidence is favorable; and (3) the evidence is material to the defense. See Moore v. Illinois, 408 U.S. 786, 794-95 (1972). Evidence is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. See United States v. Bagley, 473 U.S. 667, 682 (1985).

Even assuming that the evidence at issue satisfies the first two elements of the Brady test, Ward is unable to satisfy the third. At the very most, evidence of an additional blood type reveals only that another person was present during the murder--it does not detract from the fact that Ward's and Carter's blood types were found on the money. Further, Ward was convicted under a felony murder theory. Thus, even if there was an accomplice who actually committed the murder, Ward would still be criminally responsible for the killing. We therefore find that the withheld evidence does not create the "reasonable possibility" of a different result. See Kyles, 514 U.S. at 434.

III. Single habeas proceeding

Ward asserts that the district court erred because it "fail[ed] to consider the collateral effect of all undisclosed evidence in one joint habeas corpus," and contends that all of his alleged Brady violations

10

should have been resolved in one proceeding because, under <u>Kyles</u>, the materiality element of <u>Brady</u> requires that suppressed evidence be considered collectively, rather than item by item. <u>See Kyles</u>, 514 U.S. at 436. He particularly argues that in denying his claim that an exculpatory witness was withheld in violation of <u>Brady</u>, the state appellate court relied heavily on the blood evidence later found to be unreliable.

We find that review of all the alleged errors in a single proceeding would not have yielded a different result as Ward contends. Moreover, as discussed in the previous section, Ward never raised the issue of the third blood type to the state courts, and thus it is his own error that resulted in part of the piecemeal review of which he now complains. As to the <u>Brady</u> claim raised on direct appeal, we disagree with Ward's assertions that the state court relied heavily on the blood evidence in disposing of this claim and that a different result would have inured had the Zain issues been discovered prior to that appeal.

The facts regarding this <u>Brady</u> claim involve the State's failure to inform Ward of a witness who saw a man inside the Wendy's store shortly before the murder was believed to have taken place. The man the witness described did not match Ward's appearance. According to this witness, she rode past the Wendy's store at some time after 12:20 a.m.[5] As the driver of the car stopped at a traffic light, the witness looked out the passenger window and saw a white male in his late twenties with dark hair sitting at a table in the dining room. Although the witness could not recall if the lights in the store were on, she testified that the man had a mustache, was wearing long pants, and was slightly overweight.[6] The witness reported at least part of her observations to the police the following day, and was told that someone would be in touch with her. She was not contacted again until after the completion of the trial.

_____

[5] It was later determined that this witness did not "clock out" from her place of employment until 12:39 a.m.

[6] Oddly, the driver of the car in which the witness was a passenger testified during the state hearings that the witness told her that she saw a black male in the restaurant, and that when Ward's picture was displayed in the media a few days after the murder, the witness stated that Ward, who is black, looked like the man she had seen in the restaurant.

11

At a hearing on Ward's motion for a new trial, the State explained that although this information was in their possession, they were unaware of it. A police officer testified that investigators believed that the individual seen by the witness, described only as a male with short brown hair, was Craig Sigler, the Wendy's employee who admitted and testified to being in the store with both Ward and Carter at 12:30 a.m., and stated that as he left, Ward was still in the parking lot. Accordingly, they did not follow up on the witness' call. Although there appeared to be some discrepancy between the time the witness would have seen the white male in the restaurant and the time Sigler testified that he left, the overall difference was only in the area of fifteen minutes.

Following the new trial hearing, the state court concluded that there was no Brady violation because Ward could not demonstrate that the new evidence would have caused the jury to reach a different result. It therefore denied his motion for a new trial. While this language suggests a higher standard than the "reasonable probability" standard articulated in Bagley, this issue was relitigated on direct appeal, where the West Virginia Supreme Court of Appeals employed the appropriate standard and determined that there was no "reasonable probability" of a different result had this evidence been presented to the jury.

Although this conclusion may have relied upon the later-questioned blood evidence, there is no indication, as Ward contends, of "heavy" reliance on that evidence. Moreover, even were the blood evidence claims and this potential Brady violation raised in the same proceeding, we conclude that the same result would obtain. As summarized above, the jury would then have learned that Ward, Carter, and Sigler were alone at the Wendy's store until approximately 12:30 a.m. on the morning of the murder, and that when Sigler left the lot, Ward was still standing in the parking lot leaning against his car. During the robbery, approximately $1350, including a substantial amount of change in Wells Fargo wrappers, was taken from the store, and later that day, Ward, previously in financial distress, bought a car stereo system in cash, and his girlfriend paid off a large and overdue power bill with blood-stained currency.

Further, following his flight from HWRC authorities, a large amount of cash was also recovered from Ward's car, and a five dollar

12

bill, also stained with blood, was found in his wallet. In addition, a backpack belonging to Ward was found to contain a large amount of cash concealed within a figurine belonging to Ward's girlfriend. This backpack also contained the approximate amount in change believed to have been stolen from the Wendy's store, packaged in the same wrappers in which Wendy's change is packaged. Relevant to the appearance of blood on some of the aforementioned currency, the Wendy's store manager testified that blood was discovered both on and inside the store safe. Finally, Ward's paycheck, along with those of all other store employees, was found at the Wendy's store following the murder, and thus the aforementioned cash was not received as part of his salary.

Given this evidence, we conclude that there is no reasonable probability that had the jury learned the additional fact that Sigler might have been in the restaurant for up to fifteen minutes longer than he indicated, a different verdict would have resulted even if the jury had not heard the serology testimony. Accordingly, Ward's claim regarding a single habeas proceeding was properly denied.

IV. <u>Ineffective assistance of counsel</u>

Ward next argues that the district court erred in accepting the state court's determination that his counsel was not ineffective when he:

>a. failed to make specific objections to the State's proposed jury instructions;

>b. failed to challenge the composition of the grand jury, its procedure, or obtain its minutes;

>c. permitted past criminal behavior to be introduced into evidence;

>d. failed to call Ward as a witness;

>e. failed to strike from the jury individuals who knew the judge, a testifying police officer, and the victim;

>f. failed to include Ward's uncle on the witness list;

13

g. failed to investigate and prepare a proper defense, introduce evidence, or call Ward as a witness; and

h. allowed his uncle to remain in the courtroom despite a sequestration order, resulting in the court's decision that he could not testify.

As the district court noted, without discussion, all of these claims were considered and rejected by the state courts, and the state courts' decisions in this regard were neither contrary to, nor an unreasonable application of, clearly established federal law.

To succeed on a claim of ineffective assistance of counsel, a defendant must show: (1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance was prejudicial. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Under the first prong of Strickland, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness under "prevailing professional norms." Id. at 688. In evaluating counsel's performance, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Further, courts must not engage in hindsight; rather, they must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. See id. at 690.

To satisfy the second prong of Strickland, a defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. However, a court cannot grant relief solely because the outcome would have been different absent counsel's deficient performance. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). Instead, a court can only grant relief under the second prong of Strickland if the "result of the proceeding was fundamentally unfair or unreliable." Id. at 369.

Addressing claim (a), Ward asserts that his attorney's decision to lodge only a general objection to the jury instructions, rather than specific objections, resulted in several instructions not being preserved

14

for appeal other than for plain error review. Ward fails, however, to assert which instructions contained error, and therefore has not satisfied his burden under Strickland.

Turning to claim (b), Ward has not demonstrated any suggestion of error in the grand jury composition or proceedings. Rather, he states only that he did not know that there was a grand jury until after he was indicted, that he wanted to know who testified, and that he did not know "[what was] wrong with it or not." This demonstrates nothing more than simple curiosity regarding the proceedings and accordingly we find that the attorney's failure to conduct a "fishing expedition" on Ward's behalf neither constituted deficient performance nor prejudiced Ward in any identifiable way.

In claim (c), Ward asserts that his attorney was ineffective for allowing the fact that he was on work-release status to come before the jury. Reviewing the record, we conclude that the state circuit court correctly determined that testimony of Ward's work-release status was mandated by the facts of the crime. The evidence of Ward's flight, and the recovery of the currency from his car, were highly probative of his guilt, and this evidence could not be introduced while keeping Ward's work-release status from the jury.

Turning to claim (d), that his attorney failed to call him as a witness, Ward has not stated what he would have testified to or how his testimony would have aided his defense, and therefore he has again failed to meet the standard imposed by Strickland. See, e.g., Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997) (applying Strickland test to allegation of attorney overriding defendant's desire to testify), cert. denied, ___ U.S. ___, 66 U.S.L.W. 3556 (U.S. Feb. 23, 1998) (No. 97-7198).

Addressing claim (e), Ward states that his attorney was ineffective for allowing certain individuals to remain on the jury. Specifically: (1) juror Law, who worked in the courthouse and was therefore a nodding acquaintance of the judge and various deputies; (2) juror Duncan, who knew Fred Zain, the police serologist whose work was later discounted; and (3) juror Billups, who knew a testifying officer in the case and went to high school with the victim. When questioned by the court, each of these jurors stated that these relationships would not

15

impede their ability to be fair and impartial, and that they would review the testimony of those with whom they were acquainted just as they would that of any other witness. These statements are presumed to be true, and the jurors are therefore presumed to be impartial. See Irvin v. Dowd, 366 U.S. 717, 723 (1961); Poynter by Poynter v. Radcliff, 874 F.2d 219, 222 (4th Cir. 1989).

Juror Billups--who may have known both a testifying officer and the victim--is the individual whose presence on the jury raises the most concern, and hence we address his presence separately. Billups stated only that the testifying officer lived in the same town as he did. While this fact alone does not suggest so close a relationship with the officer as to call Billups' impartiality into question, we note that Billups referred to the officer by an apparent nickname, suggesting more than a passing familiarity. As to the victim, Billups stated that he went to high school with her. No further inquiry was made as to how well, or even if, he actually knew her. We note, however, that at the time of her murder, Carter was twenty-four years old, and thus, presumably, had been out of high school for several years.

The state habeas court did not address this particular ineffective assistance of counsel claim, stating instead that it had already been addressed on direct appeal. Review of the state court's decision on appeal reveals that the court reviewed the underlying claim for an abuse of discretion and found none. See State v. Ward, 424 S.E.2d 725, 737 (W. Va. 1991). The court also noted, however, that Ward's attorney neither sought additional voir dire of these witnesses, nor challenged them for cause. See id.

While the state habeas court should have considered Ward's claim of ineffective assistance of counsel in greater detail given the appellate court's statement regarding the absence of an objection, we find that given Ward's failure to rebut the presumption of impartiality afforded under Supreme Court precedent, the state appellate court's decision was not contrary to clearly established federal law. Accordingly, under the standard set forth in § 2254(d), we find that the district court's dismissal of this claim was appropriate.

In claims (f) and (h), Ward asserts that his attorney was ineffective for failing to include his uncle on the witness list given to the State,

16

and for allowing him to remain in the courtroom in violation of a sequestration order, with the combined result that his uncle was not allowed to testify. Ward argues that these failures were prejudicial because his uncle would have testified that he loaned or gave him $2000 a short time before the murder, explaining why Ward suddenly had such a large amount of cash. While this argument appears convincing at first, further investigation suggests that Ward is altering the content of his uncle's proposed testimony to bolster his case.

At an in camera hearing, it was revealed that Ward's uncle would testify to loaning him $300 in small bills of varying denominations. At his state habeas hearing, however, Ward testified that his uncle had given him $2000 and would have testified to this effect. The state habeas court found this change of dollar amount to be suspect and supportive of the trial court's determination that the uncle, having had the benefit of hearing the evidence regarding the amount stolen, might have tailored his testimony to conform to the defense position advocated by Ward.

Moreover, even had Ward's uncle been allowed to testify, there is not a reasonable probability that the result of his trial would have been different. Had the uncle testified that he loaned Ward $300, the testimony would not have explained the additional currency found in Ward's car and his backpack. Had he testified that he loaned Ward $2000, the testimony would not have explained why a large amount of change, matching the amount likely taken from the Wendy's restaurant, and rolled in the same Wells Fargo wrappers used by the restaurant, was found in Ward's backpack. Accordingly, we conclude that Ward cannot demonstrate prejudice under Strickland, and that the state court's dismissal of this claim was therefore not contrary to clearly established federal law.

Finally, addressing claim (g), Ward contends that his attorney did not conduct a proper defense, introduce evidence, or call Ward as a witness. The failure to call Ward as a witness has already been discussed. Turning to Ward's remaining claims, they center largely on the attorney's failure to call a witness who Ward alleges saw him at a gas station around the time the murder was believed to have taken place. Because the time of the murder was given as sometime between midnight and 2:00 a.m., Ward's presence at a gas station,

17

where he allegedly stayed only long enough to purchase two dollars' worth of gasoline, is not sufficiently probative of innocence such that the attorney's alleged failure to contact this witness was prejudicial to Ward.

Ward also contends that his attorney should have proven, through either receipts or store records, that a week or so prior to the murder Ward purchased additional car stereo equipment from the same music electronics employee who testified at trial as to Ward's purchase on the date of the murder. According to Ward, such evidence would have been beneficial because it would have served to impeach the witness, who stated that he had not seen Ward prior to the day of the murder, and because it would have demonstrated that he had sufficient funds to purchase such equipment. Again, this information is highly speculative, and Ward presents no evidence, other than his own assertion, that he actually purchased any equipment other than that on the day of the murder. We therefore find that he has shown neither prejudice nor substandard performance in regard to this claim.

V. Conclusion

Having found the district court's disposal of all of Ward's claims to be appropriate, we affirm the district court's order as to Ward's claims regarding the serology evidence,[7] and deny a certificate of appealability and dismiss as to the remainder of Ward's claims. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED IN PART; DISMISSED IN PART
_____

[7] The district court granted a certificate of appealability as to these claims.

18